MAINE STEAMSHIP CO. (WELLS v.). See Case No. 17,401.

---

## Case No. 8,978.

### MAISONNAIRE et al. v. KEATING.

[2 Gall. 325.] [1]

Circuit Court, D. Massachusetts. May Term, 1815.

PRIZE — BILL GIVEN FOR RANSOM — QUESTION OF PRIZE—HOW DECIDED—CONTRABAND GOODS —PROPERTY OF NEUTRAL.

1. A bill of exchange. expressed to be for the ransom of a vessel, and given as collateral security for the payment of the ransom bill. was *held* to be a contract, on which an action may be sustained in a court of common law—the plaintiff and payee being an alien friend.
[Cited in Waring v. Clarke, 5 How. (46 U. S.) 500.]

2. In an action upon such a bill of exchange. the capture must be taken to be justifiable, and the ransom regular.

3. A court of common law cannot, even incidentally, decide a question of prize.
[Cited in U. S. v. New Bedford Bridge. Case No. 15,867: Brown v. Noyes, Id. 2,023; Studley v. Baker, Id. 13,559.]

4. It seems, that provisions. when destined to a port of naval equipment of the enemy. and a fortiori, if destined for the supply of his army. become contraband. and subject the vessel and cargo to confiscation by the other belligerent— more especially, if the country of the captured vessel be at war with the country, to which she is destined.
See The Commercen [Case No. 3,055].

5. Of the probable cause, which justifies capture by a friendly belligerent.

6. Duress, arising from threats of destruction of the vessel and cargo, cannot be admitted to avoid a contract of ransom. where the capture was justified by probable cause.

7. It is competent for a friendly belligerent to ransom the property of a neutral after capture.

8. Of the foundation and nature of ransom.
See Abb. Shipp. pt. 4. c. 4, § 2. note 2; Story's Ed. 1829. pt. 4, c. 3. § 2; also, pt. 4. c. 10, p. 477. 7th Lond. Ed. of the same book, by Sergeant Shee.

---

[1] [Reported by John Gallison, Esq.]

9. The admiralty has exclusive jurisdiction to entertain suits on ransom bills.

[Cited in Knox v. The Ninetta, Case No. 7,-912: Leland v. The Medora, Id. 8,237; Jackson v. The Magnolia, 20 How. (61 U. S.) 328.]

Assumpsit on a bill of exchange in the following words: "At sea, in the longitude of 27° west from Paris, and in the latitude of 37° 39' north, on board the privateer Invincible, French, of Bayonne, ninety days after sight this my first of exchange, second of the same tenor and date unpaid, I promise to pay to Messrs. Michael Maisonnaire and Derouet, merchants, Bayonne, five thousand dollars, for the ransom of brig Nancy & Mary and cargo, to be paid at Boston. April 3, 1813. Richard Keating." Upon the trial of the cause under the general issue, it appeared that the bill was presented for acceptance on the 29th of March, 1814, and protested for non-payment on the 30th of June of the same year. It further appeared, that the defendant was master of the brig, at the time of her capture by the Invincible; that she was an American vessel, and sailed, on the 7th of March, 1814, from Wilmington, N. C. bound to Lisbon, having on board a cargo of corn and rice of the value of $15,000, and a protection and license for the voyage from the British government, commonly called a Sidmouth license; that, after the capture, the captain of the Invincible threatened to burn and destroy the brig and her cargo, and actually made preparation for that purpose, and that thereupon the defendant agreed to ransom the same for $5000, and accordingly executed a ransom bill in the form prescribed by the French ordinances, and, as a collateral security, or in the language of the ransom bill, as a hostage,[2] gave the bill of exchange in controversy. Upon the execution and delivery of these papers, the vessel was released, and safely pursued her voyage to Lisbon, and had since returned to the United States. Upon this evidence, a verdict was, by consent, taken for the plaintiffs, for the amount of the bill of exchange and interest, subject to the opinion of the court upon the questions of law arising in the case. The defendants moved for a new trial, upon the grounds, which will appear in the argument and opinion of the court.

Mr. Prescott and Mr. Blake, Dist. Atty. for defendants.

1. In this case a common law court has no jurisdiction. The act of the cruiser was either a marine trespass, or it was a capture as prize. If the former, then the promise was without consideration and void. But the facts show, that it was a taking as prize. The transacton was intended as a ransom, which may be defined, "a restoration of property captured, for the use of the owner, for a stipulated price." The contract of ransom grows out of the capture as prize, and is founded on it. The capture is the principal thing, and the ransom but an accessory. This then is not a mere maritime question. It is not like the case of seamen's wages, arising partly on land and partly on the sea, and therefore of doubtful jurisdiction; but it is one depending solely on national law—on the jus belli. To determine, whether there was a consideration, it becomes necessary to inquire, whether the capturing vessel was commissioned, and whether there was probable cause for the capture. These are not questions to be submitted to a jury. As they grow out of capture, they belong exclusively to the admiralty, and from the exclusive cognizance of that court there results a general benefit, in the uniformity of decisions in different countries. The weight even of common law authorities is with the defendants. In the case of Ricord v. Bettenham, 3 Burrows, 1734, 1 W. Bl. 563, the question was, what effect the death of the hostage should have; and the question of jurisdiction was waived by the counsel. In Cornu v. Blackburne, Doug. 641, the point of jurisdiction was not considered, and the principal subject of discussion was, whether by a capture of the ransom bill the contract was dissolved. In Anthon v. Fisher, Id. 649, note, two judges were against the jurisdiction, but the case was finally decided on another point. See Cond. Marsh. 504.

2. It is not competent for a belligerent to ransom the property of a citizen of a friendly nation. This appears from the nature and form of the contract. It is called a repurchase, and the property is supposed to have been first devested. But the property of neutrals does not vest in the captors until condemnation. The property of an enemy is, by the law of war, devested immediately on the capture; but that of a friend can be forfeited only by some misconduct, which must be made judicially to appear. The cruiser has no authority to pardon. It is essential to a ransom-bill, that it should protect the property ransomed to its port of destination. 2 Valin, Comm. 286, lib. 3, tit. 9, art. 19; 1 Emer. 477; Le Guidon, c. 6, arts. 3, 7, 9. But the usual cause for the seizure of vessels of friendly powers being the carrying of contraband goods, the cruiser cannot grant a safe-conduct to the port of destination. The owners of a neutral ship provide her with proper documents, and take upon themselves the risk of their being legal. They give no authority to the master to compromise. The French law requires that a hostage be given together with the ransom-bill. No hostage can be given by a friendly power. 2 Valin, Comm. 282, lib. 3, tit. 9, art. 19; 1 Code des Prises, 278.

3. There was no legal cause of capture. If the cruiser have a right to ransom the property of a friend, it can only be, when

[2] The bill of exchange was recited in the ransom-bill, and there said to be received "instead of hostage."

it is lawfully captured. If the capture be unlawful, then the promise was extorted by violence and is not binding. This court has a right to inquire into the cause of the capture, and the legality of the ransom. It is not denied that the courts of the captor have this right. But in ransoming, the captor agrees to transfer the right to the court of the captured, in which, it is known, the contract of ransom must be enforced. It is incident to every tribunal, that has original jurisdiction, to inquire into the consideration and the manner of obtaining the contract. It would be a mockery, in such a case, to compel the captured to pay the ransom, and then to look to a court of the captors for damages. What circumstances, then, were there in the present case, which could make the property good prize to the belligerent? It was American, regularly documented, and bound on a lawful voyage. There is no pretence of contraband. The British license, however it might be a cause of forfeiture to our government, could not be so to any other. The reasons for inflicting this penalty are, that the act of sailing under a license of the enemy involves a breach of the duty of the citizen; that it leads to a commercial intercourse, which, in time of war, is dangerous; that the citizen thereby creates a neutrality for himself; and that it shows a connexion with the enemy. With the conduct of our citizens, in any of these respects, a nation in amity with us can have no concern. It would have been lawful, in time of peace, to take such a certificate, and our rights are not altered by a war. Suppose that our government had permitted its citizens to take licenses of this description; could a friendly power interfere? It is to be recollected, that we were not allies of France. The cargo was not for the use of the British, but was going to our own consul. There was, therefore, nothing which could justify a condemnation. When the vessel was captured, the only question was, whether she was an enemy, or had forfeited her neutrality. The ransom shows, that the captor knew her to be an American. The neutral character was not forfeited by merely having a British license on board. But even if the circumstances were such as to justify sending in, this would not authorize the master to ransom.[3]

D. Davis and Mr. Sohier, for plaintiffs.

Two questions arise out of the facts, as they have been stated. 1. Has the court jurisdiction? 2. Was there a legal consideration for the contract?

In regard to the first question, it is to be observed, that the case is within the express words of the statute. The jurisdiction of the court over the parties is unquestionable, the plaintiff being an alien, and the defendant a citizen of the United States. The subject matter, too, or the contract, is one, which is every day enforced in courts of common law. It is a bill of exchange, and intended by the parties to be governed by the rules of the common law. But even if the laws of nations are to be taken into view, there would seem to be no reason, why these should not be noticed by a common law court, as well as the maritime or the ecclesiastical law. This, then, being a contract between persons who were able to contract, and who were not subjects of hostile states, and being, in its nature, such as is usually enforced in courts of common law, the right of the plaintiffs, and the jurisdiction of the court are established, unless some of the objections, urged by the defendant, should prevail.

It is said, that a question of prize is involved in the case, which makes it exclusively cognizable by the admiralty. But the contract, upon the face of it, does not necessarily involve a question of prize. The words in the bill of exchange, "for the ransom," &c. express the consideration for which it was given. It does not, from these words, appear, that the contract grew out of a capture as prize. A ransom bill may be given under such circumstances, that no legal question of prize or no prize can result. It is difficult to imagine, whence the doubts arose in the minds of the judges in the case of Anthon v. Fisher, Doug. 649, note. They are completely answered by the argument of Dr. Wynne in reply to Dr. Scott. This action is not founded on a ransom bill, and, in that respect, it is stronger than the case of Ricord v. Bettenham, 3 Burrows, 1734, which is the only one, in which the question of jurisdiction has been decided.

Another important distinction, which differs this case from any arising in Europe, is, that by the statute creating this court and defining its jurisdiction, the right of a common law remedy is expressly reserved to the citizen, in all cases where it may be had. The common law jurisdiction is uniformly preferred by the laws and constitution of our country. There is, therefore, every motive to induce the court to adopt that construction, which favors the common law jurisdiction. The reason that, in England, actions upon contracts, and for torts, which depends upon the laws of nations, are held to

---

[3] Yates v. Hall, 1 Term. R. 73, and Helly v. Grant, there cited, and Browne, Civ. & Adm. Law, 260, were cited by defendant's counsel. In the course of the argument, Story, J., inquired of the defendant's counsel, if they supposed the form of the contract to be of any importance? Prescott.—If the ransom did not conform to the law of France, it could afford no protection against a subsequent capture, and so,

not having the effect, which was contemplated by the parties, the ransom-bill ought not to be enforced. Story, J.—I have no doubt, that the law of France, as to the form of the contract, cannot affect its validity here. It is no more to be regarded, than the statute of frauds would be in France, in reference to a contract for lands made in this state. Prescott said, it was not his intention to urge this point.

belong exclusively to the court of admiralty, is, that they are such, as must be governed by the municipal law entirely, if at all. 4 Bl. Comm. 67. Such are marine assaults, forcible abduction of property on the high seas, &c. Here the whole subject matter is either out of the jurisdiction of the common law court, or within it. But the principle now contended for is, that where the court has jurisdiction of the principal question, it has also jurisdiction of the question of prize or no prize, if incidentally arising. A contract made on the land to be executed at sea, is cognizable in the common law courts. Hoare v. Unton, 4 Inst. 139. · It is believed to be equally true, that a contract made at sea to be executed on the land, is cognizable at common law. Personal contracts have no situs; they are to be governed by the law of the place, where they are to be performed. By enforcing this contract in a court of common law, the defendant is not deprived of any right, which he would have in the admiralty. In that court, the very giving of the ransom bill would be held an implied hypothecation of the ship. The general authority of the master would be sufficient for this purpose; but, in this case, the master was also an owner. Wilson v. Bird, 1 Ld. Raym. 22; Tranter v. Watson, 2 Ld. Raym. 931. The owners are bound, by the law of nations and the law merchant, to accept a bill of exchange drawn by the master of the ship for ransom. Marsh. Ins. 432; 1 Emer. 472. In the case of Ricord v. Bettenham, 3 Burrows, 1734, but better reported 1 W. Bl. 560, this question was expressly decided. Great interest was then excited by it, and the most eminent lawyers were engaged. Blackstone, after examining authorities and consulting foreign lawyers, declined to argue for the defendant. Lord Mansfield said, he was in favor of the jurisdiction upon principle. but doubted, principally, because it was confidently stated by counsel, that in other countries, an action would not be sustained on such a contract. A question of prize, arising incidentally in a case of insurance, may be entertained and decided upon. Berens v. Rucker [1 W. Bl. 313] Marsh. Ins. 430; Bingham v. Cabot, 3 Dall. [3 U. S.] 19.

It is contended, that the legality of the capture is admitted by the bill of exchange; but if the court should be of a different opinion, the plaintiff is prepared to show that the vessel was, to all intents and purposes, prize of war.

STORY, Circuit Justice. This question is open only in consequence of your consenting, that the evidence should go to the jury, and having been open at the trial, it must be so here. I was prepared to rule against the admission of the evidence.

Mr. Davis. From the facts, as reported, it is evident, that had the vessel been captured by an American cruiser and brought in, she would have been liable to condemnation by the law of nations.

STORY, Circuit Justice. In the case of The Julia [Case No. 7,575]; Id., 8 Cranch [12 U. S.] 181,—the ground of decision expressly was, that the taking of a license impressed upon the ship a hostile character.

Mr. Davis. It is upon that ground, that the plaintiffs rely. And further, the license has all the effect of a British convoy. It is impossible to contend, after the principles that have been adopted in the cases decided, that this ship would not have been condemned, if carried into France.

STORY, Circuit Justice. The case was thought stronger, at the argument of The Julia, with regard to a neutral than an American. Had a French vessel been going, with a British license, to supply the British armies, it would have been an unneutral act.

Mr. Davis. Every reason that can apply to a neutral, applies with still greater force to a co-belligerent.

STORY, Circuit Justice. Three points have been argued in behalf of the defendant. First. That this is a question of prize, over which this court, sitting in its common law capacity, has no jurisdiction. Secondly. That it is not competent for a friendly belligerent to demand or take a ransom, for restoring the property of a neutral after capture. Thirdly, That there was no legal cause for the capture, and consequently no valid consideration for the contract of ransom. Each of these points involves important considerations of national law, and deserves a separate examination. For convenience, however, they will be discussed in an order, the reverse of that adopted in the argument.

And, in the first place, was the capture legal? Assuming for a moment, that it is competent for a court of common law to entertain such an inquiry, this question must be answered by reference to the law of nations, and the prize regulations of France. For the legality of the conduct of the captors may under circumstances, exclusively depend upon the ordinances of their own government. If, for instance, the sovereign should, by a special order, authorize the capture of neutral property for a cause manifestly unfounded in the law of nations, there can be no doubt, that it would afford a complete justification of the captors in all tribunals of prize. The acts. of subjects, lawfully done under the orders of their sovereign, are not cognizable by foreign courts. If such acts be a violation of neutral rights, the only remedy lies by an appeal to the sovereign, or by a resort to arms. A capture, therefore, under the Berlin and Milan decrees, or the celebrated orders in council, although they might be violations of neutral rights, must still have been deemed, as to the captors, a rightful capture, and have authorized the exercise of all the usual rights of war. It is quite another question, whether

a neutral tribunal of prize would lend its aid, to enforce such captures, though, perhaps, in the strictness of national law, it would be bound to abstain from all obstruction of the captors.

Under circumstances, therefore, it might have become material to the plaintiffs, to institute an inquiry into the law of prize, as regulated and administered in the tribunals of France. But, upon the facts of the present case, such an inquiry may well be waived. It is clear, beyond any reasonable doubt, that by the law of nations, the vessel and cargo were confiscable. Here was a cargo of provisions destined for the principal port of military and naval equipment of an enemy of France, and, as the British license obviously implied, for the use of the allied British and Portuguese armies acting against France. Admitting that provisions are not, in general, contraband of war, it is clear that they become so, when destined to a port of naval equipment of an enemy, and a fortiori, when destined for the supply of his army. Nor is this all. The carrier vessel, and master were American, and open hostilities existed between the United States and Great Britain, at the very moment when the voyage was undertaken. It has been already settled in our own courts, that the acceptance of, and sailing under, a license of the British government, is such an act of illegality in an American citizen, as rightfully subjects the property to forfeiture. The ground of this determination is, that the act is utterly inconsistent with the duties, which a belligerent citizen owes to his own government, and is such an incorporation into the objects and interests of the enemy, as stamps the party with a completely hostile character. It is certainly not competent, in general, for a friendly belligerent to enforce by confiscation the mere municipal regulations of a foreign government, or to punish foreigners for a mere breach of allegiance or duty towards their own government. But, it will be difficult to show that an act, which, by the law of nations, is held to impress a hostile character on the party with reference to his own government, shall not have precisely the same effect as to all other belligerents, against whom the act may be directed. The case of The Clarissa, cited 5 C. Rob. Adm. 4, has been supposed to indicate a different doctrine; but it certainly will not support it, and, after the answer given to that case in The Julia [Case No. 7,575], Id., 8 Cranch [12 U. S.] 181, it is unnecessary to give it a further consideration. Upon either ground, therefore, that the cargo was contraband of war, or that the whole adventure was tainted with hostile interests and connexions, the property would have been justly condemnable as prize of war. It is not, however, necessary to assume this ground, incontestible as it seems to be. It is sufficient to justify the conduct of the captors, if there is probable cause for the capture. See The Invincible [Case No. 7,054]. In the present case, it is quite impossible to doubt on this point. The very presence of a British license, on board of an enemy's vessel laden with a cargo of provisions, afforded a violent presumption of concealed British interests, or of subserviency to British policy. The capture was strictly legal, and although this unfavorable presumption would not justify the destruction of the vessel and cargo on the high seas, yet it would have authorized a carrying of them in for adjudication, if not for condemnation. But even if the captors had proceeded to destroy the vessel and cargo, the only remedy for this wanton and unjust excess of authority would have been in the courts of the sovereign of the captors. The commission of the sovereign, although abused, would still exonerate the parties from the imputation of piracy. And this leads us to the consideration of the argument, urged by the defendant, that the ransom bill was extorted by duress. There is no pretence, that it was procured by personal duress, or maltreatment. The only duress pretended is, the threat to burn and destroy the vessel and cargo; and the ransom bill was given to save them. Threats of this sort cannot, either by the common or the maritime law, be admitted to avoid a solemn contract of ransom, where the capture was justified by probable cause; and a fortiori, where condemnation must have ensued the regular prize proceedings. The first ground of defence cannot be supported.

The second question is, whether it be competent for a friendly belligerent to demand, or take, a ransom for restoring the property of a neutral after capture. It is argued by the defendant, that every ransom supposes a vested right in the captors; that this does not exist in respect to neutrals, for the captors have only a right to bring in for adjudication; that neutral property is liable to condemnation, only in case of delinquency; and that captors have no right to remit, in behalf of their sovereign, a forfeiture for violation of neutral duties. It is not true, however, that the right to take a ransom is founded in a vested title in the captors to the captured property. For, whether the property vest after twenty-four hours' possession, or after bringing infra praesidia, as seems the doctrine of civilians; or after condemnation, as is the doctrine of Great Britain; it is clear, that the right to take a ransom exists from the moment of capture. And, by the general practice of the maritime world, a decree of condemnation is deemed necessary to ascertain and confirm the inchoate title of the captors, at least in respect to the sovereign and subjects of their own country. Nor is a ransom, strictly speaking, a repurchase of the captured property. It is rather a repurchase of the actual right of the captors at the time, be it what it may; or, more properly, it is a relinquishment of all the interest and benefit, which the captors might acquire or consummate in the property by the regular adjudications of a prize tribunal, whether it be

an interest in rem, a lien, or a mere title to expenses. In this respect, there seems to be no legal difference between the case of a ransom of the property of an enemy, and of a neutral. For if the property be neutral, and yet there be probable cause of capture, or if the delinquency be such, that the penalty of confiscation might be justly applied; there can be no intrinsic difficulty in supporting a contract, by which the captors agree to waive their rights in consideration of a sum of money voluntarily paid, or agreed to be paid, by the captured. Indeed, the case stands upon a stronger ground, than that of a ransom between enemies; for the latter have not, in general, a capacity to enter into contracts. The very law of war prohibits all commercial intercourse, and suspends all existing contracts between enemies; and the case of ransoms is almost the only exception, which has been admitted, from the general rule. If, then, neither the subject matter, nor the nature of the title or consideration, nor the capacity of the parties, presents any serious objection to the contract, as between a friendly belligerent and a neutral, it remains to consider, if there be any thing in the objection, that it is a remitter of the right of forfeiture, which belongs exclusively to the sovereign. The commission of the sovereign, in general, authorises only captures of enemies' property. But without any express clause, this commission clearly extends to the capture of all neutral property seized in violating neutral duties, for in such case the property is deemed quasi enemies' property. And, for the same reason, it authorises the bringing in of property, under neutral passports and papers, for adjudication, where there is probable cause to suspect its real character; for, until adjudication, it cannot be ascertained, whether it be entitled to the protection of the neutral character. If, therefore, the commission gives hostile property to the captors, and enables them to deliver it up on ransom, it also enables them to do the same in respect to neutral property, which has acquired a hostile taint; and the ransom is not, in the one case, any more an exercise of the sovereign's prerogative to remit a forfeiture, than it is in the other. In both instances, it is considered, by the law of nations, as a mere remitter of the rights of the captors acquired jure belli; and every prohibition of its exercise must expressly depend upon the municipal regulations of the particular country. Upon principle, therefore, the distinction of the counsel for the defendant, as to the incompetency of a belligerent to deliver neutral property on ransom, is unsupported; and there is not a scintillation of authority in its favor.

The next and most important question is, whether this is a case within the jurisdiction of a court of common law. It has been truly said by the plaintiffs' counsel, that the plaintiffs, being alien friends, are entitled to sue in this court; and, that a bill of exchange is a contract clearly cognizable at the common law. There is nothing, therefore, in the character of the parties, or of the contract, which should induce the court to decline jurisdiction. It is the consideration of the contract, which purports on its face to have been given for a ransom, and was in fact given as collateral security for a ransom bill, that creates the difficulty of entertaining jurisdiction. It is argued, that the legality of the consideration of a bill of exchange may always be inquired into, and that, as the legality of a ransom bill involves the question of prize or no prize, a court of common law is not competent incidentally to decide such a question. It exclusively belongs to the admiralty to adjudicate on questions of prize, and by parity of reason also on questions of ransom. Primarily, all questions of prize belong to the tribunals of the capturing power; and foreign tribunals will not interfere, unless where their territorial jurisdiction or rights have been violated. And ransoms, taken upon captures, belong to the same jurisdiction, and may be there enforced or set aside. It is however competent for the captors, if they so choose, to change the forum in cases of ransom, and to apply for redress in any country, where the person or property can be found. And, in such case, the proper tribunal undoubtedly is, a court sitting to administer the law of nations. Whether a foreign court is bound to enforce such a ransom without inquiring into the legitimacy of its origin, upon the principle of comity; or whether it will remit the parties to their own forum, to ascertain and settle that point; or will of itself examine and decide it; it is not now necessary to consider. On a proper occasion, it will be fit to give the subject a very liberal and dispassionate consideration. At all events, there can be no doubt, that a ransom is a subject within the jurisdiction of the admiralty. It is taken for granted in the discussions of the courts of common law, and has been asserted without contradiction by the admiralty. Is this jurisdiction exclusively vested in the admiralty? On this point the parties are at issue; and the same authorities have been pressed into service on both sides. Three cases have been relied upon, viz. Ricord v. Bettenham, 3 Burrows, 1734, 1 W. Bl. 563; Cornu v. Blackburne, Doug. 641; and Anthon v. Fisher, Id. 649, note 1. In all these cases, the action was brought directly on the ransom bill in a court of common law. In the first, the point of jurisdiction was expressly waived by counsel, although stated in the report to be greatly relied upon by civilians. In the second, the point was not started. In the last, the exception was taken by Doctor (now Sir William) Scott on the argument in the king's bench, when Lord Mansfield declared his opinion in favor of the plaintiff; Willes, J., and Buller, J., thought that the courts of common law had no jurisdiction, and that the objection might be taken, although not par-

ticularly pleaded; Ashhurst, J., expressed doubts on that point, and judgment was given pro forma for the plaintiff. This judgment was afterwards reversed in the exchequer chamber upon another point, so that the question of jurisdiction never came to a solemn decision. It remains therefore to be determined in the case at bar. And I have no hesitation to pronounce, that the cognizance of ransom bills exclusively belongs to the admiralty. They necessarily involve the question of prize or no prize, of the legality of the capture, and of the regularity of the commission and conduct of the captors. They also may involve questions as to the prize ordinances of foreign governments, the practice and regulations of courts of prize, and the rights and duties of neutrals. Of most of these questions, it cannot be pretended, that courts of common law have cognizance, and all of them seem more fit for the investigation and determination of a court of the law of nations. Every reason urged in the case of Le Caux v. Eden, Doug. 594, against the jurisdiction as to prize, applies with equal force as to ransoms. Indeed, it might be correctly declared, with greater force; for the rights of foreign captors, a subject of a very delicate and national character, necessarily come into discussion; and these rest upon the great doctrines of the jus belli.

It is very clear, that, in this case, no action for damages could be maintained at common law, even if the capture had been tortious; for it was a taking as prize. Admitting that trespass will lie, at common law, for a marine tort on the high seas (a doctrine somewhat difficult to sustain upon principle, although not upon authority), it is otherwise, if the supposed trespass be a seizure as prize. And it is immaterial, whether the objection be presented directly on the record, or arise at the trial, for if the decision of prize or no prize be involved, it exclusively belongs to the admiralty. And this leads us to the argument of the plaintiffs' counsel, that where the principal matter is cognizable at common law, every incident of prize may be there also tried. I should pause a great while, before I should admit the soundness of this doctrine, in the latitude, in which it is stated. If a question of prize be necessarily involved in the foundation of an action, whether it be as a principal or as an incident, I shall be glad to learn, how the common law can draw it ad aliud examen than the prize jurisdiction. Suppose a question as to the right to prize proceeds should arise; could a court of common law, in an action for money had and received, incidentally entertain the question, as to who are the actual or constructive captors? Such a jurisdiction has never yet been asserted. Camden v. Home, 4 Term R. 382; Duckworth v. Tucker, 2 Taunt. 6. Suppose a marine assault and battery were the subject of a suit, could the common law sustain an inquiry into the nature and propriety of the sup-

posed trespass, when it appeared to have been an incident to a capture? Such a pretension has been expressly over-ruled. Le Caux v. Eden, Doug. 594. It is said, however, that in an action on a policy of insurance, the question of prize has been and may be legally entertained and decided. The cases cited do not come up to the position. Wherever any remarks, touching the legality of captures, have fallen from the court, they have been made with reference to the conduct of the captured, or to the effect of sentences of condemnation and acquittal in matters of prize. In no instance has the court undertaken to decide a question of prize, forming a necessary incident in such a cause. And it is extremely difficult to conceive how it could so do. For if the admiralty has, as it is conceded on all sides it has, jurisdiction over the incidents, as well as the principal matter of prize, it must be just as much exclusive in the first case, as in the last. And it would be strange, if the admiralty might decide an incident of prize one way, and a court of common law might collaterally over-rule the sentence.

Upon the mere footing of general reasoning, it appears to me difficult to resist the impression, that the cognizance of ransoms belongs exclusively to the admiralty. And, taking into consideration the clear opinion of civilians, and the judgment of Mr. J. Buller and Mr. J. Willes, in Anthon v. Fisher, after a very elaborate argument, the weight of authority is on the same side. If, therefore, this were an action upon a ransom bill, I should be prepared to deny the jurisdiction of a court of common law. Can the case of a bill of exchange, given as collateral security for the payment of a ransom bill, be distinguished in principle? This question presents the turning point of the cause, and is not unattended with difficulties. On the one hand, if the legality of the consideration be, under all circumstances, inquirable into, then the same questions of prize may arise, as on the ransom bill itself. On the other hand, the contract of exchange is clearly cognizable at common law, and it is not easy to see, how the collateral origin of the consideration should defeat the jurisdiction. It never was imagined, that an action upon a policy of insurance could be defeated, at common law, by the circumstance that the loss claimed was a ransom after capture; and as little can it be imagined, that, in such an action, it is competent for the court to settle the question, whether the property be good prize or not. Suppose a mortgage of land had been given as collateral security for the ransom, would the admiralty have entertained jurisdiction, to give possession to the captors, or to foreclose the equity of redemption? No person would pretend to assert such a doctrine. Suppose, on the other hand, a stipulation, and a mortgage as collateral security, on the bailment of captured property, would a court of common law en-

tertain an inquiry as to the legality of the capture, before it could enforce it?

On the whole, on this point I have come to the conclusion, although not without diffidence, that the present action may be sustained in this court. I consider the bill of exchange, as the parties have considered it, as merely collateral to the ransom. The consideration of it, involving matter of prize, is not inquirable into at common law. It must here be taken, that the capture was justifiable, and the ransom regular. If it were otherwise, a remedy lies in the admiralty courts of France, and perhaps of the United States, to set aside the ransom bill, and restore the parties to their rights. If an action were brought, at common law, upon a collateral security like the present, under circumstances calling for inquiry, the court might suspend its judgment, or a court of equity might grant an injunction, until the parties should have ascertained, in the proper prize tribunal, the validity of the ransom bill, or of the original capture. I have the less hesitation in adopting this conclusion, because the facts of the case abundantly show, that the capture was rightful, and that of course the ransom was valid. It would, therefore, be turning round the parties to another jurisdiction without a hope of benefit. I will only add, that if I had thought the case not cognizable at common law, the circumstance, that the objection was not pleaded in abatement, would have had no weight with me. Where the subject matter is not within the jurisdiction of the court, the exception may be taken under the general issue. Let judgment be entered on the verdict for the plaintiffs.