THOMAS JACKSON, WILLIAM HIGDON, AND ARCHIBALD OLDS, OWNERS OF THE STEAMBOAT WETUMPKA, LIBELLANTS AND APPELLANTS, *v.* THE STEAMBOAT MAGNOLIA, HER TACKLE, &c., WILLIAM F. JAMES, MASTER, &c.

The admiralty jurisdiction of the courts of the United States extends to cases of collision upon navigable waters, although the place of such collision may be within the body of a county of a State, and may be above the flux and reflux of the tide.

The District Courts exercise this jurisdiction over fresh-water rivers "navigable from the sea," by virtue of the judiciary act of 1789, and not as conferred by the act of 1845, which extends their jurisdiction to the great lakes and waters "not navigable from the sea."

THIS was an appeal from the District Court of the United States for the middle district of Alabama.

The case came up on an appeal from the judgment of the District Court, dismissing the libel for want of jurisdiction, after the following agreement had been filed:

Be it remembered, that on the trial of this cause, which was a libel in admiralty, it was agreed that the question of jurisdiction should be submitted to the court on the facts hereinafter stated, which were admitted to be true; and if the court should be of the opinion that the court had jurisdiction of the cause, then the cause should be submitted to a jury for trial. But if the court should be of opinion that it was without jurisdiction, the libel would be dismissed, and in the event an appeal was taken to the Supreme Court of the United States, and the judgment of that court should reverse the judgment of this court, then the cause should be remanded to this court for trial.

The court agreed so to try the question of jurisdiction on the facts, which are admitted to be as follows: The steamboat Wetumpka was a vessel engaged in navigation and commerce

between the port of New Orleans, in Louisiana, and the port of Montgomery, in Alabama, and was regularly licensed and enrolled as a coasting vessel, and was of more than thirty tons burden. The steamboat Magnolia was a boat regularly licensed and enrolled for the coasting trade, but was built for a packet boat to be employed between Mobile, Alabama, and Montgomery, Alabama. She was built in the Western country, and brought round to this State, and has ever since been engaged in running between Mobile and Montgomery, and has never been engaged in any other trade.

The collision, which is the subject of the libel against the Magnolia, took place between her and the Wetumpka, on the Alabama river, about two hundred miles above tide-water. The Magnolia is a boat of over thirty tons burden. The foregoing are the facts in which the question of jurisdiction is submitted to the court, together with the libel and claim, and answer thereto.                                 WATTS & DARGAN,
*For the Magnolia and Claimants.*
HENRY C. SEMPLE,
*For the Libellants.*

The case was argued at the preceding term of this court upon printed arguments by *Mr. Francis Lee Smith* for the appellants, and *Mr. Dargan* for the appellees; also orally by *Mr. Phillips* for the appellees.

The difficulty of abbreviating arguments made by counsel upon constitutional points, and the circumstance that both sides of the question of jurisdiction are fully presented in the opinion of the court and in the dissenting opinions of Mr. Justice DANIEL and Mr. Justice CAMPBELL, are reasons why the Reporter omits sketches of the arguments of counsel. It will be perceived, also, that Mr. Justice McLEAN delivered a separate opinion, although concurring in the judgment of the court.

Mr. Justice GRIER delivered the opinion of the court.

The only question presented for our consideration on this appeal is, whether the court below had jurisdiction.

The libel purports to be in a cause of collision, civil and maritime. It alleges that the steamboat Wetumpka, a vessel of three hundred tons burden, was on a voyage from New Orleans to the city of Montgomery, in Alabama; that while ascending the Alabama river, she was run into and sunk by the steamboat Magnolia, which was descending the same.

The answer of the respondents, among other things, alleges "that the collision took place far above tide-water, on the

Alabama river, in the county of Wilcox, in the State of Alabama, and therefore not within the jurisdiction of the District Court sitting in admiralty."

This plea was sustained by the court, and the libel dismissed. The record does not disclose the reasons on which this judgment was based. It is presumed, therefore, to be founded on the facts stated in the plea, viz:

1. That the collision was within the body of a county.
2. That it was above tide-water.

1. The Alabama river flows through the State of Alabama. It is a great public river, navigable from the sea for many miles above the ebb and flow of the tide. Vessels licensed for the coasting trade, and those engaged in foreign commerce, pass on its waters to ports of entry within the State. It is not, like the Mississippi, a boundary between coterminous States. Neither is it, like the Penobscot, (see Veazie *v.* Moore, 14 How., 568,) made subservient to the internal trade of the State by artificial means and dams constructed at its mouth, rendering it inaccessible to sea-going vessels. It differs from the Hudson, which rises in and passes through the State of New York, in the fact that it is navigable for ships and vessels of the largest class far above where its waters are affected by the tide.

Before the adoption of the present Constitution, each State, in the exercise of its sovereign power, had its own court of admiralty, having jurisdiction over the harbors, creeks, inlets, and public navigable waters, connected with the sea. This jurisdiction was exercised not only over rivers, creeks, and inlets, which were boundaries to or passed through other States, but also where they were wholly within the State. Such a distinction was unknown, nor (as it appears from the decision of this court in the case of Waring *v.* Clark, 5 How., 441) had these courts been driven from the exercise of jurisdiction over torts committed on navigable water within the body of a county, by the jealousy of the common-law courts.

When, therefore, the exercise, of admiralty and maritime jurisdiction over its public rivers, ports, and havens, was surrendered by each State to the Government of the United States, without an exception as to subjects or places, this court cannot interpolate one into the Constitution, or introduce an arbitrary distinction which has no foundation in reason or precedent.

The objection to jurisdiction stated in the plea, "that the collision was within the county of Wilcox, in the State of Alabama," can therefore have no greater force or effect from the fact alleged in the argument, that the Alabama river, so far as it is navigable, is wholly within the boundary of the State.

It amounts only to a renewal of the old contest between courts of common law and courts of admiralty, as to their jurisdiction within the body of a county. This question has been finally adjudicated in this court, and the argument exhausted, in the case of Waring *v.* Clark. After an experience of ten years, we have not been called on by the bar to review its principles as founded in error, nor have we heard of any complaints by the people of wrongs suffered on account of its supposed infringement of the right of trial by jury. So far, therefore, as the solution of the question now before us is affected by the fact that the tort was committed within the body of a county, it must be considered as finally settled by the decision in that case.

2. The second ground of objection to the jurisdiction of the court is founded on the fact, that though the collision complained of occurred in a great navigable river, it was on a part of that river not affected by the flux and reflux of the tide, but "far above it."

This objection, also, is one which has heretofore been considered and decided by this court, after full argument and much deliberation. In the case of the Genesee Chief, (12 How., 444,) we have decided, that though in England the flux and reflux of the tide was a sound and reasonable test of a navigable river, because on that island tide-water and navigable water were synonymous terms, yet that "there is certainly nothing in the ebb and flow of the tide that makes the waters peculiarly suitable for admiralty jurisdiction, nor anything in the absence of a tide that renders it unfit. If it is a public navigable water on which commerce is carried on between different States or nations, the reason for the jurisdiction is precisely the same. And if a distinction is made on that account, it is merely arbitrary, without any foundation in reason—and, indeed, contrary to it." The case of the Thomas Jefferson (10 Wheaton) and others, which had hastily adopted this arbitrary and (in this country) false test of navigable waters, were necessarily overruled.

Since the decision of these cases, the several district courts have taken jurisdiction of cases of collision on the great public navigable rivers. Some of these cases have been brought to this court by appeal, and in no instance has any objection been taken, either by the counsel or the court, to the jurisdiction, because the collision was within the body of a county, or above the tide. (See Fritz, *v.* Bull, 12 How., 466 ; Walsh *v.* Rogers, 13 How., 283; The Steamboat New World, 16 How., 469; Ure *v.* Kauffman, 19 How., 56; New York and Virginia S. B. Co. *v.* Calderwood, 19 How., 245.)

In our opinion, therefore, neither of the facts alleged in the answer, nor both of them taken together, will constitute a sufficient exception to the jurisdiction of the District Court.

It is due however, to the learned counsel who has presented the argument for respondent in this case, to say, that he has not attempted to impugn the decision ot this court in the case of Waring *v.* Clark, nor to question the sufficiency of the reasons given in the case of the Genesee Chief for overruling the case of the Thomas Jefferson; but he contends that the case of the Genesee Chief decided that the act of Congress of 1845, "extending the jurisdiction of the District Court to certain cases upon the lakes," &c., was not only constitutional, but also that it conferred a new jurisdiction, which the court did not possess before; and consequently, as that act was confined to the lakes, and "to vessels of twenty or more tons burden, licensed and employed in the business of commerce and navigation between ports and places in different States and Territories," it cannot authorize the District Courts in assuming jurisdiction over waters and subjects not included in the act, and more especially where the navigable portion of the river is wholly within the boundary of a single State. It is contended also that the case of Fritz *v.* Bull, and those which follow it, sustaining the jurisdiction of the court of admiralty over torts on the Mississippi river, cannot be reconciled with the points decided in the former case, as just stated, unless on the hypothesis that the act of 1845 be construed to include the Mississippi and other great rivers of the West; which it manifestly does not.

But it never has been asserted by this court, either in the case of Fritz *v.* Bull, or in any other case, that the admiralty jurisdiction exercised over the great navigable rivers of the West was claimed under the act of 1845, or by virtue of anything therein contained.

The Constitution, in defining the powers of the courts of the United States, extends them to "all cases of admiralty and maritime jurisdiction." It defines how much of the judicial power shall be exercised by the Supreme Court only; and it was left to Congress to ordain and establish other courts, and to fix the boundary and extent of their respective jurisdictions. Congress might give any of these courts the whole or so much of the admiralty jurisdiction as it saw fit. It might extend their jurisdiction over all navigable waters, and all ships and vessels thereon, or over some navigable waters, and vessels of a certain description only. Consequently, as Congress had never before 1845 conferred admiralty jurisdiction over the Northern fresh-water lakes *not* "navigable from the sea," the District Courts could not assume it by virtue of this clause in the Con-

stitution. An act of Congress was therefore necessary to confer this jurisdiction on those waters, and was completely within the constitutional powers of Congress; unless, by some unbending law of nature, fresh-water lakes and rivers are necessarily within the category of those that are not "navigable," and which, consequently, could not be subjected to "admiralty jurisdiction," any more than canals or railroads.

When these States were colonies, and for a long time after the adoption of the Constitution of the United States, the shores of the great lakes of the North, above and beyond the ocean tides, were as yet almost uninhabited, except by savages. The necessities of commerce and the progress of steam navigation had not as yet called for the exercise of admiralty jurisdiction, except on the ocean border of the Atlantic States.

The judiciary act of 1789, in defining the several powers of the courts established by it, gives to the District Courts of the United States "exclusive original cognizance of all civil cases of admiralty and maritime jurisdiction, including all seizures, &c., when they are made on waters which are *navigable from the sea* by vessels of ten or more tons burden, &c,, as well as upon the high seas."

So long as the commerce of the country was centred chiefly on the Eastern Atlantic ports, where the fresh-water rivers were seldom navigable above tide-water, no inconvenience arose from the adoption of the English insular test of "navigable waters." Hence it was followed by the courts without objection or inquiry.

But this act does not confine admiralty jurisdiction to tidewaters; and if the flux and reflux of the tide be abandoned, as an arbitrary and false test of a "navigable river," it required no further legislation of Congress to extend it to the Mississippi, Alabama, and other great rivers, "navigable from the sea." If the waters over which this jurisdiction is claimed be within this category, the act makes no distinction between them. It is not confined to rivers or waters which bound coterminous States, such as the Mississippi and Ohio, or to rivers passing through more than one State; nor does the act distinguish between them and rivers which rise in and pass through one State only, and are consequently "*infra corpus comitatus.*" The admiralty jurisdiction surrendered by the States to the Union had no such bounds as exercised by themselves, and is clogged with no such conditions in its surrender. The interpolation of such conditions by the courts would exclude many of the ports, harbors, creeks, and inlets, most frequented by ships and commerce, but which are wholly included within the boundaries of a State or the body of a county.

*Jackson et al.* v. *Steamboat Magnolia.*

It seems to have been assumed, in the argument of this case, that because the District Courts had not exercised their admiralty jurisdiction above tide-water before the decision of this court of the case of the Genesee Chief, that such jurisdiction had been exercised by them as conferred by the act of 1845. It is upon this mistaken hypothesis that any difficulty is found in reconciling that case with the case of Fritz *v.* Bull, which immediately followed it.

The act of 1845 was the occasion and created the necessity for this court to review their former decisions.

It might be considered in fact as a declaratory act reversing the decision in the case of the Thomas Jefferson. We could no longer evade the question by a judicial notice of an occult tide without ebb or flow, as in the case of Peyroux *v.* Howard, (7 Pet., 343.) The court were placed in the position, that they must either declare the act of Congress void, and shock the common sense of the people by declaring the lakes not to be "navigable waters," or overrule previous decisions which had established an arbitrary distinction, which, when applied to our continent, had no foundation in reason.

In conclusion, we repeat what we then said, that "courts of admiralty have been found necessary in all commercial countries, not only for the safety and convenience of commerce, and a speedy decision of controversies where delay would be ruin, but also to administer the laws of nations in a season of war, and to determine the validity of captures and questions of prize or no prize in a judicial proceeding. And it would be contrary to the first principles on which this Union was formed, to confine these rights to the States bordering on the Atlantic, and to the tide-water rivers connected with it, and to deny them to the citizens who border on the lakes, and the great navigable streams of the Western States. Certainly, such was not the intent of the framers of the Constitution; and if such be the construction finally given to it by this court, it must necessarily produce great public inconvenience, and at the same time fail to accomplish one of the great objects of the framers of the Constitution; that is, perfect equality in the rights and privileges of the citizens of the different States, not only in the laws of the General Government, but in the mode of administering them."

The decree of the court below, dismissing the libel for want of jurisdiction, is therefore reversed, and it is ordered that the record be remitted, with directions to further proceed in the case as to law and justice may appertain.

Mr. Justice McLEAN delivered a separate opinion, and Mr.

Justice CATRON, Mr. Justice DANIEL, and Mr. Justice CAMPBELL, dissented. Mr. Justice CATRON concurred with Mr. Justice CAMPBELL in the opinion delivered by him.

Mr. Justice McLEAN:

I agree to the decision in this case; but as I wish to be on one or two points somewhat more explicit than the opinion of the court, I will concisely state my views.

The Constitution declares that the judicial power shall extend "to all cases of admiralty and maritime jurisdiction." The judiciary act of 1789 provides, "that the District Courts shall have exclusive original cognizance of all civil cases of admiralty and maritime jurisdiction."

The act of the 25th February, 1845, is entitled "An act to extend the jurisdiction of the District Courts to certain cases upon the lakes and navigable waters connecting with the same." This act was considered by Congress as extending the jurisdiction of the District Court; and it was so, very properly, treated by the court in the case of the Genesee Chief.

In the opinion, it was said this act was not passed under the commercial power, but under the admiralty and maritime jurisdiction given in the Constitution. No terms could be more complete than those used in the Constitution to confer this jurisdiction. In all cases of admiralty and maritime jurisdiction, such suits may be brought in the District Court.

This jurisdiction was limited in England to the ebb and flow of the tide, as their rivers were navigable only as far as the tide flowed. And as in this country the rivers falling into the Atlantic were not navigable above tide-water, the same rule was applied. And when the question of jurisdiction was first raised in regard to our Western rivers, the same rule was adopted, when there was no reason for its restriction to tide-water, as in the rivers of the Atlantic. And this shows that the most learned and able judges may, from the force of precedent, apply an established rule where the reason or necessity on which it was founded fails.

In England and in the Atlantic States, the ebb and flow of the tide marked the extent of the navigableness of rivers. But the navigability of our Western rivers in no instance depends upon the tide.

By the civil law, the maritime system extends over all navigable waters. The admiralty and maritime jurisdiction, like the common-law or chancery jurisdiction, embraces a system of procedure known and established for ages. It may be called a system of regulations embodied and matured by the

most enlightened and commercial nations of the world. Its origin may be traced to the regulations of Wisbuy, of the Hanse Towns, the laws of Oleron, the ordinances of France, and the usages of other commercial countries, including the English admiralty.

It is, in fact, a regulation of commerce, as it comprehends the duties and powers of masters of vessels, the maritime liens of seamen, of those who furnish supplies to vessels, make advances, &c., and, in short, the knowledge and conduct required of pilots, seamen, masters, and everything pertaining to the sailing and management of a ship: As the terms import, these regulations apply to the water, and not to the land, and are commensurate with the jurisdiction conferred.

By the Constitution, "Congress have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." The provision, "among the several States," limits the power of Congress in the regulation of commerce to two or more States; consequently, a State has power to regulate a commerce exclusively within its own limits; but beyond such limits the regulation belongs to Congress. The admiralty and maritime jurisdiction is essentially a commercial power, and it is necessarily limited to the exercise of that power by Congress.

Every voyage of a vessel between two or more States is subject to the admiralty jurisdiction, and not to any State regulation. A denial of this doctrine is a subversion of the commercial power of Congress, and throws us on the Confederation. It also subverts the admiralty and maritime jurisdiction of the Federal courts, given explicitly in the Constitution and in the judiciary act of 1789.

In this case, the steamboat Wetumpka was engaged in a commerce between New Orleans, in Louisiana, and Montgomery, in Alabama. The Magnolia was running between Mobile and Montgomery, in the State of Alabama. The Wetumpka, within the State of Alabama, was as much under the Federal jurisdiction as it was in the State of Louisiana. No one will contend that one State may regulate the commerce of another; nor can it be maintained that the power to regulate the commerce of the Wetumpka in this case was in either State. It was a commerce between the two States, which comes within the definition of commerce expressly given to Congress. While thus protected and regulated by the power of Congress, the Wetumpka was run into by the Magnolia, and sunk, in the Alabama river; and it is earnestly contended that the admiralty can give no remedy for this aggravated trespass. Since the decision in the case of the Genesee Chief by seven

*Jackson et al.* v. *Steamboat Magnolia.*

judges, only one dissenting, the admiralty jurisdiction has been constantly applied on all our lakes and rivers of the North; and some of the cases have been reviewed in this court without objection. The navigators of the Alabama river must have been more prudent and skilful than those of the North, or their voyages were less frequent, if the above collision is the first that has occurred on the Alabama river.

It is true, the Magnolia was engaged in a commerce strictly within the State; but this does not exonerate her, as the trespass was on a vessel protected by the admiralty law. Cases have frequently occurred on the Ohio and Mississippi rivers, where steamboats, having run down and sunk flat-boats, were held responsible for the injury in the admiralty. And if a steamer is liable in such cases, a remedy for an injury done to it cannot be withheld in the same court.

In the Genesee Chief case, (12 How., 443,) this court held: "The admiralty jurisdiction granted to the District Courts of the United States under the Constitution extends to the navigable rivers and lakes of the United States, without regard to the ebb and flow of the tides of the ocean." It is difficult to perceive how this language could have been mistaken, as alleged by the counsel in argument. All the lakes and all the navigable rivers in the Union are declared to be subject to this jurisdiction without reference to the tide, and it overrules all previous decisions on that subject.

It was said in that case the act of 1845 extended the jurisdiction of the admiralty; and this was so, as by the act of 1789 it was limited to rivers navigable from the sea by vessels of ten tons burden and upwards.

It is alleged that the assumption of this jurisdiction will absorb matters of controversy and the punishment of offences and misdemeanors now cognizable in the courts of the State, without the trial by jury, and before a foreign tribunal, contrary to the wishes and interests of a State.

The admiralty and maritime jurisdiction has been in operation on all the navigable rivers of our Atlantic coast since the organization of the Government, and its exercise has not been found dangerous or inconvenient. Experience is a better rule of judgment than theory. If this jurisdiction has been found salutary in that part of our country which is most commercial, it cannot be injurious or dangerous in those parts which are less commercial.

The Federal courts have no cognizance of common-law offences, on the land or on the water. Jurisdiction has been conferred on them of common law and chancery in specified cases, in every State and Territory of the Union; but I am not

aware that this has been considered a foreign jurisdiction, or one that has been dangerous to the people of any State. Occasional conflicts of jurisdiction have arisen between this tribunal and the State courts, to preserve the rights guarantied by the Federal Constitution; but this became necessary in maintenance of the fundamental law of the Union. And if Congress should deem it necessary for the regulation of our internal commerce, amounting to more than ten hundred millions of dollars annually, to enact laws for its protection, they will no doubt be as mindful of the rights of the States as of those who, by their enterprise and wealth, carry on the commerce of the country.

Every one knows how strenuously the admiralty jurisdiction was resisted in England by the common-law lawyers, headed by Coke. The contest lasted for two centuries. The admiralty civilians contended that the statutes of Richard II and 2 H. IV did not curtail the ancient jurisdiction of the admiralty over torts and injuries upon the high seas, and in ports within the ebb and flow of the tide, which was shown by an exposition of the ancient cases, as was opposed by the common-law courts; but they continued the contest until they acquired a concurrent jurisdiction over all maritime causes, except prize. The vice-admiralty courts in this country, under the colonial Government, exercised jurisdiction over all maritime contracts, and over torts and injuries, as well in ports as upon the high seas, and this was the jurisdiction conferred on our courts by the Constitution.

But it was not until a late period that the jurisdiction of the admiralty in England was settled by the statute of 3 and 4 Victoria, c. 67, passed in 1840. This is entitled "An act to improve the practice and extend the jurisdiction of the High Court of Admiralty in England." And it is gratifying to the bar and bench of this country to know, that the above statute has placed the English admiralty substantially on the same footing that it is maintained in this country. To this remark it is believed there are but two or three exceptions. Insurance, ransom, and surveys, are believed to constitute the only exceptions. The flow of the tide, as before remarked, is used to designate the navigableness of their rivers. Whether an insurance is within the admiralty, has not been considered by this court. It is singular, that while the English admiralty, by its extension, has been placed substantially upon the same basis as our own, ours should be denounced as having a dangerous tendency upon our interests and institutions, and a desire expressed to abandon the enlightened rules of the civil law, and follow the misconstrued statutes of Richard II.

Antiquity has its charms, as it is rarely found in the common walks of professional life; but it may be doubted whether wisdom is not more frequently found in experience and the gradual progress of human affairs; and this is especially the case in all systems of jurisprudence which are matured by the progress of human knowledge. Whether it be common, chancery, or admiralty law, we should be more instructed by studying its present adaptations to human concerns, than to trace it back to its beginnings. Every one is more interested and delighted to look upon the majestic and flowing river, than by following its current upwards until it becomes lost in its mountain rivulets.

Mr. Justice DANIEL dissenting:

Against the opinion of the court in this cause, and the doctrines assumed in its support, I feel constrained solemnly to protest.

If in the results which have heretofore attended repeated efforts on my part to assert what are regarded both as the sacred authority of the Constitution and the venerable dictates of the law were to be sought the incentive to this remonstrance, this act might appear to be without motive; for it cannot be denied that earnest and successive remonstrances have succeeded still wider departures from restrictions previously recognised, until in the case before us every limit upon power, save those which judicial discretion or the propensity of the court may think proper to impose, is now cast aside. But it is felt that in the discharge of official obligation there may be motives much higher than either the prospect or the attainment of success can supply; and it may be accepted as a moral axiom, that he who, under convictions of duty, cannot steadily oppose his exertions, though feeble and unaided, to the march of power, when believed to be wrongful, however overshadowing it may appear, must be an unsafe depositary of either public or private confidence. My convictions pledge me to an unyielding condemnation of pretensions once denominated, by a distinguished member of this court, "the silent and stealing progress of the admiralty in acquiring jurisdiction to which it has no pretensions;" and still more inflexibly of the fearful and tremendous assumptions of power now openly proclaimed for tribunals pronounced by the venerable Hale, by Coke, and by Blackstone, and by the authorities avouched for their opinions, to have been merely tolerated by, and always subordinate to, the authority of the common law—an usurpation licensed to overturn the most inveterate principles of that law; licensed in its exercise to invade the jurisdic-

tion of sovereign communities, and to defy and abrogate the most vital immunities of their social or political organization. I cannot, without a sense of delinquency, omit any occasion of protesting against what to my mind is an abuse of the greatest magnitude, and one which, hopeless as at present the prospect of remedy may appear, it would seem could require nothing but attention to its character and tendencies to insure a corrective. It must of necessity be resisted in practice, as wholly irreconcilable with every guarantee of the rights of person or property, or with the power of internal police in the States.

Having, in cases formerly before this court, (vid. 6 How., p. 395 et seq., New Jersey Steam Navigation Company v. Merchants' Bank; 10 How., p. 607, Newton v. Stebbins; 12 How., 465, Genesee Chief v. Fitzhugh; 18 How., p. 269, Ward v. Peck;) traced with some care the origin of the admiralty jurisdiction in England, and the modes and limits to which that jurisdiction was there subjected, no farther reference will here be made to the authorities by which that investigation has been guided, than is necessary to illustrate the origin and extent of the like jurisdiction as appertaining to the tribunals of the United States. Amongst the novelties which are daily brought to notice, it would not awaken very great surprise to hear it contended, in the support of a favorite theory or posision, that the admiralty courts of England were not governed by the laws and ordinances of that country, or in effect that England did not govern herself; but has been, and still is, controlled by some foreign or extraneous authority. Something not unlike this strange idea has, on more than one occasion, been intimated; and with respect to her colonies, strictly subordinate as they are known to have ever been in political and legislative power to the mother country, it has been broadly asserted that these have been released from the restrictions upon the admiralty in the mother country, whilst this emancipation is coupled with the incongruous position that they (and the United States, as once forming a portion of those colonies) are more or less subject to the admiralty regulations of every petty community in the world. I am constrained to repel such an argument, if argument it can be called, as consonant neither with reason nor historical accuracy. The only known difference between the administration in admiralty courts in the mother country and in her American colonies, was created *by express statute*, with reference to the *revenue;* was limited to the single regulation prescribed by the statute; and has, by every writer upon the subject, been treated as a *special* direction, applicable solely to the matter of which it

treated, and as neither entering into, nor deducible from, any regular and constitutional attribute of the admiralty jurisdiction. It was an exception, an anomaly, and in its nature and operation was unique and solitary. Of the same character, precisely, is the provision of the eleventh section of the judiciary act of 1789, which invests the District Courts with jurisdiction in cases of seizure under the laws of imposts of the United States. This provision confers, in the first place, in general terms, without limitation, on the District Courts, *admiralty and maritime jurisdiction.* So far, then, as it was the purpose to constitute these tribunals courts of admiralty, the jurisdiction conferred by the language of the act just quoted was complete. The District Courts were thereby created courts of admiralty to all intents and purposes; but the section goes on to add to the powers of the District Courts, the cognizance of other subjects not regularly appertaining to the jurisdiction of the admiralty, viz: of *seizures under the laws of imposts;* subjects belonging to a class which was in England peculiarly cognizable in the court of exchequer, and under the authority and process of the common law.

The conclusion, then, from the eleventh section of the judiciary act, is inevitably this: that the power thereby vested with respect to *seizures,* is not an *admiralty* power—was never conferred by the investment of admiralty power in accordance with the Constitution; but is in its character distinct therefrom, and is peculiar and limited in its extent. Such appears to have been the opinion of two distinguished commentators upon the admiralty jurisdiction of the courts of the United States, Chancellor Kent and Mr. Dane; the former of whom, in the 1st vol. of his Commentaries, p. 376, holds this language: "Congress had a right, in their discretion, to make all seizures and forfeitures cognizable in the District Courts; but it may be a question whether they had any right to declare them to be cases of admiralty jurisdiction, if they were not so by the law of the land when the Constitution was made. The Constitution secures to the citizen trial by jury in all criminal prosecutions, and in all civil suits at common law where the value in controversy exceeds twenty dollars. These prosecutions for forfeitures of large and valuable portions of property, under the revenue laws, are highly penal in their consequences; and the Government and its officers are always parties, and deeply concerned in the conviction and forfeiture. And if, by act of Congress or by judicial decisions, the prosecution can be turned over to the admiralty side of the District Court, as being neither a criminal prosecution nor a suit at common law, the trial of the cause is then transferred from a jury of the country to

the breast of a single judge. It is probable, however, that the judiciary act did not intend to do more than to declare the jurisdiction of the District Courts over these cases; and that all the prosecutions for penalties and forfeitures upon seizures under laws of imposts, navigation, and trade, were not to be considered of admiralty jurisdiction when the case admitted of a prosecution at common law; for the act saves to *suitors in all cases* the right to a common-law remedy, where the common law was competent to give it. We have seen that it is competent to give it; because, under the vigorous system of the English law, such prosecutions *in rem* are in the exchequer, according to the course of the common law; and it may be doubted whether the case of La Vengeance, on which all subsequent decisions of the Supreme Court have rested, was sufficiently considered. The vice-admiralty courts in this country when we were colonies, and also in the West Indies, obtained jurisdiction in *revenue causes* to an extent totally unknown to the jurisdiction of the English admiralty, and with powers as enlarged as those claimed at the present day. But this extension, *by statute*, of the jurisdiction of the American vice-admiralty courts beyond their ancient limits to revenue cases and penalties, was much discussed and complained of at the commencement of the Revolution." Judge Conkling also, in his Treatise on the Admiralty, vol. 2, p. 391, says: "In England, all revenue seizures are cognizable *exclusively* in the *exchequer;* and such of them as are cognizable on the admiralty side of the District Courts of the United States are made so *only by force of a legislative act.*"

From the above exposition of the jurisdiction of the vice-admiralty courts in the British colonies, it is manifest that neither by custom nor practice, nor by positive enactment, has there ever been created in those courts any power or jurisdiction appertaining to their character and constitution strictly as courts of admiralty, which they did not derive regularly by their commission from the Lord High Admiral. Brown, in his Civil and Admiralty Law, vol. 2, p. 490, says of these courts, "that all powers of the vice-admiralty courts within His Majesty's dominions are derived from the High Admiral, or the Commissioners of Admiralty in England, as inherent and incident to that office. Accordingly, by virtue of their commission, the Lords of the Admiralty are authorized to erect vice-admiralty courts *in North America,* the West Indies, and the settlements of the East India Company; and in case any person be aggrieved by sentence, or interlocutory decree having the force of a sentence, he may appeal to the High Court of Admiralty." So, too, Blackstone, vol. 3, p. 68, says: "Appeals from the

vice-admiralty courts *in America*, and our other plantations and settlements, may be brought before the courts of admiralty in England, as being a branch of the Admiral's jurisdiction."

It may here be pertinently asked, how, with this exposition of the law, can be reconciled the assertion that at the time of the American Revolution, and down to the adoption of the Constitution of the United States, there were vested in the colonial courts of England, and were appropriate to them as courts of admiralty, powers which never were vested in their superior, by whom they were created, and by whom they were to be supervised and controlled? With perfect respect, it would seem to imply an incongruity, if not an absurdity, to ascribe to any tribunal an appellate or revisory power with reference to matters beyond its legitimate jurisdiction, and which confessedly belonged to a different authority. Yet is this assertion of jurisdiction in admiralty in the colonial courts beyond that of their creator and superior, constantly renewed *arguendo*, whilst, in reply to repeated challenges of authority by which the assumption may be sustained, not one adjudication in point has been adduced. Again, it may be asked whether, in the history of jurisprudence, another instance can be found in which it is alleged that a *system, a corpus juris*, has grown up and been established, and yet not an ingredient, not a fragment of any such *system* can be discovered? But there have been decisions which were made in this country—decisions cotemporaneous with the event of the separation from the mother country; but these decisions, respectable for their learning and ability, so far from sustaining the *obiter* assertion above mentioned, divest it of even plausibility; for they affirm and maintain a complete conformity and subordination of the admiralty jurisdiction in the colonies, to that which had prevailed in England from the time of the statutes of Richard, and from the days of Owen, Brownlow, Hobart, Fortescue, and Coke. I refer to the case of Clinton *v.* The Brig Hannah, decided by Judge Hopkinson, of Pennsylvania, in 1781, and the case of Shrewsbury *v.* The Sloop Two Friends, decided by Judge Bee, of South Carolina, in 1786. And, indeed, the phrase "admiralty jurisdiction," except in the acceptation received by us from the English courts, is without intelligible or definite meaning, for under no other system of jurisprudence is the law of the marine known to be administered under the same organization.

Let us now take a view of the claims advanced for the admiralty power, in its constant attempts at encroachment upon the principles and genius of the common law, and of our republican and peculiar institutions, at least from the decision in the

case of the Thomas Jefferson, in the 10th of Wheaton, p. 428, to that of the Genesee Chief *v.* Fitzhugh, in the 12th of Howard, 443, inclusive; this last a case, to my apprehension, more remarkable and more startling as an assumption of judicial power than any which the judicial history of the country has hitherto disclosed, prior to the case now under consideration.

By the statute of 13th Richard II, cap. 15th, it is enacted, that "the Admirals and their deputies shall meddle with nothing done *within the realm*, but only with things done upon the *sea;*" and by the 15th of Richard II, cap. 3d, "that in all contracts, pleas, and quarrels, and other things done within the bodies of counties, *by land or water*, the Admiral shall have no cognizance, but they shall be tried by the law of the land." The language of these provisions is truly remarkable. By that of the first is denounced the exclusion, utterly, of the Admiral's power from the entire realm; by that of the second, is as explicitly denied to him all cognizance of things done *in the bodies of the counties, either by land or by water.* And the statute of Henry IV, cap. 11, by way of insuring a sanction of these exclusions, provides, "that he who finds himself aggrieved against the form of the statutes of Richard, shall have his action grounded upon the case against him who so pursues in the admiralty, and recover double damages." Lord Hale, in his History of the Common Law, speaking of the court of admiralty, says, (p. 51:) "This court is not bottomed or founded upon the authority of the civil law, but hath both its powers and jurisdiction by the law and custom of the realm in such matters as are proper for its cognizance." And again, in an enumeration of matters not within the cognizance of the admiralty, he continues: "So also of damages in *navigable rivers within the bodies of counties*, things done upon the shore at low-water mark, wreck of the sea, &c.; these things belong not to the Admiral's jurisdiction." And the cause, the only cause assigned as the foundation of that jurisdiction, is the peculiar locality of each instance, viz: its being neither within the body of any county or vicinage, nor *infra fauces terræ*, so that the venue or *pays* can be summoned for its trial. No one pretends to doubt that thus stood the admiralty law of the realm of England at the period of separation from the American colonies, and perhaps in the particulars above mentioned it may remain the unchanged law of that country to the present moment, as it is a fact recorded in history, that for a departure from that law, one of the most learned and brilliant of her admiralty judges (Sir William Scott, afterwards Lord Stowell) was condemned in a very heavy verdict. Such, I say, was the law of the realm of England, and I think that the fallacy or pretence of any change in

the admiralty law proper of that realm, in its application to the colonies, has been clearly demonstrated.

The admiralty law of England, according to every accurate test, was the admiralty law of the United States at the period of the adoption of the Constitution. It is pertinent in this place to remark, that the jurisdiction of the admiralty having been, both by the common law and by the language of the statutes of Richard II and Henry IV, excluded not only from the body of the counties, both on the land and on the water, and even from the *realm*, it followed, *ex consequenti*, that the locality of that jurisdiction was (and necessarily so) within the ebb and flow of the tide. Hence, it is more than probable, arose the adoption and use of the phrase as a portion of the description of the locus of that jurisdiction, viz: that it was *maritime*, i. e., connected with or was upon the sea, and was neither upon the land nor within the *fauces terræ*, nor upon any navigable water within a county, and was within the ebb and flow of the tide.

Under such a state of the admiralty law, conceded to be the law of England, and as I contend, the law of the United States, came before this court for decision the case of the Thomas Jefferson, in the 10th of Wheaton, p. 428. In this case, not a single ingredient required by the English cases to give jurisdiction existed. It could by no possibility or by any propriety of language be styled *maritime*, as every fact it presented occurred at the distance of a thousand miles from the ocean, and it could not be shown that there ever existed a tide in the water-course on which the occurrences that produced the suit originated. Yet, in the absence of these essential ingredients of admiralty jurisdiction, the court, with that greed for power by which courts are so often impelled beyond the line of strict propriety, makes a query, whether, under the show of *regulating commerce*, Congress might not assert a distinctive and original authority, viz: the power of the admiralty. The court, however, felt itself constrained to concede the necessity of a locality within the ebb and flow of the tide, and for the want of that requisite to deny the jurisdiction.

In the case of Peroux v. Howard, 7 Pet., 524, the necessity for the ebb and flow of the tide to give jurisdiction is equally conceded; but the court, in order to maintain its power, deems itself authorized to appeal *virtute officii*, not to the attraction of the moon, the received philosophic explanation of this phenomenon, but to the current of the Mississippi, which, in precipitating itself upon the waters of the Gulf, occasions, they say, by conflict with the latter, some changes in the rise and fall of the river at New Orleans. This *judicial* theory of the

tides possesses at least the characteristic of novelty. Whether it will be accepted, and find a place in the annals of scientific discovery, may admit of some doubt.

Next follows in order of time the case of the Steamboat New Orleans v. Phœbus et al., 11 Pet., p. 175. In this case, as in that of Peroux v. Howard, the vessel libelled was in the same city of New Orleans, one of the termini of her trading voyages, and adjudged by the case last mentioned to be within the ebb and flow of the tide. It was contended by the counsel for the claimants of the steamboat New Orleans, a gentleman now upon this bench, that the situation of the steamboat libelled in each case, as conferring jurisdiction by reason of locality, was identical; and it surpasses any acumen I possess, to perceive any real distinction between the cases. The court, however, speaking through the late Justice Story, (whom none could ever suspect of any leaning against the admiralty,) insisting with consistent pertinacity on the requisite of *the ebb and flow of the tide*, said: "The case is not one of a steamboat engaged in maritime trade and navigation. Though in her voyages she may have touched at one terminus of them in *tide-waters*, her employment has been substantially on other waters. The admiralty has not any jurisdiction over vessels employed on such voyages in cases of disputes between part owners. The *true test* of its jurisdiction in all cases of this sort is, whether the vessel be engaged substantially in maritime navigation, or in interior navigation and trade *not on tide-waters*. In the latter case, there is no jurisdiction. So that, in this view, the District Court had no jurisdiction over the steamboat involved in the present controversy, as she was wholly engaged in voyages on such *interior* waters."

In the case of Waring et al. v. Clark, in the 5th of How., 441, and in that of the New Jersey Steam Navigation Company v. The Merchants' Bank, in the 6th of How., 344, anomalous as these cases appear to me, and wholly unsustained either, as I deem them, by English precedent or by that construction of the Federal Constitution which is warranted, nay demanded, by the language of the Constitution, by history, or precedent, yet they both concur in establishing the *ebb and flow of the tide* as the test of jurisdiction in the admiralty. As, for example, in the former of these last-mentioned cases, the court announces the conclusion at which it had arrived, and which it proposed to demonstrate by argument and authority, in the following terms, viz: "It is the first time that the point has been distinctly presented to this court, whether a case of collision in our rivers, *where the tide ebbs and flows*, is within the admiralty jurisdiction of the courts of the United States if the locality

be, in the sense in which it is used by the common-law judges in England, *infra corpus comitatus.* It is this point that we are now about to decide, and it is our wish that nothing which may be said in the course of our remarks shall be extended to embrace any other case of contested admiralty jurisdiction." Thus, too, in the second of these cases, Nelson, J., as the organ of the majority of the court, p. 392, propounds these propositions: "On looking into the several cases in admiralty which have come before this court, and in which its jurisdiction was involved or came under observation, it will be found that the inquiry has been, not into the jurisdiction of the court of admiralty in England, but into the nature and subject-matter of the contract, whether it was a maritime contract, and the service a maritime service, to be performed upon the *sea, or upon waters within the ebb and flow of the tide.*" And again: "The exclusive jurisdiction in admiralty was conferred on the National Government, as closely connected with the grant of the commercial power. It is a *maritime* court, instituted for the purpose of administering *the law of the seas.* There seems to be ground, therefore, for restraining its jurisdiction in some measure within the grant of the commercial power, which would confine it in cases of contracts to those concerning the navigation and trade of the country, *upon the high seas and tide-waters,* with foreign countries, and amongst the several States. Contracts growing out of the purely internal commerce of the State, *as well as commerce beyond tide-waters,* are generally domestic in their origin and operation, and could scarcely have been intended to be drawn within the cognizance of the Federal courts."

These several decisions, founded, as they are believed to have been, in error, and upon a misconstruction of the law, of the Constitution, and the history of the country, in so far as they sought to permit invasions of the territorial, municipal, and political rights of the States, are, nevertheless, not entirely without their value. By the limit they prescribed to the admiralty, viz: the ebb and flow of the tide, they at least rejected the ambitious claim to undefined and undefinable judicial discretion over the Constitution and the law, (and the indispensable territorial rights of the States,) and so far fortified the foundations of a Government, based, in theory at any rate, upon restricted and exactly-defined delegations of power only. It was under the stress of the aforegoing decisions, and, as is well known, upon an application of a portion of this court, that the act of Congress of February 26, 1845, cap. 22, was passed, with the sole view of extending the admiralty jurisdiction to cases arising upon the lakes, and upon the rivers con-

necting the said lakes, on which there were no tides, and which (*i. e., the lakes*) were within no State limits.  Here, then, we have the exception, the solitary exception, fortifying the general rule as to the admiralty jurisdiction, which jurisdiction is again described and defined in this provision of the statute above quoted, as existing upon the *high seas* or upon the *tidewaters* of the United States only.

This interference by the legislative department of the Government, elicited, too, by the judiciary department, whether within the competency of the former, under the Constitution, or not, must be received by every reasonable rule of induction as a concession, by both, that there existed a propriety or necessity for the enlargement of the admiralty jurisdiction over the lakes, and the rivers which connected them, in which there were no tides, and that whatever extension was either called for or made must be the result of legislative action, and not of mere judicial discretion.  The repeated and explicit decisions of this court already cited, and the act of Congress of 1845, might, it is supposed, have been regarded as some earnest of uniformity and certainty in defining the admiralty jurisprudence of the United States, at least upon the points adjudged, and as to the provisions of the statute; but, in this age of *progress,* such anticipations are held to be amongst the wildest fallacies.  It is now discovered that the principles asserted by the admiralty courts in England, or said to have been propounded by the mysterious, unedited, and unproduced proceedings of the colonial vice-admiralty courts, so often avouched here in argument; the decisions of this court and the provisions of the act of 1845, are all to be thrown aside, as wholly erroneous. That the admiralty power is not to be restricted by its effect upon the territorial, political, or municipal rights and institutions upon which it may be brought to bear, nor by any checks from the authority of the common law.  That there is but one rule by which its extent is to be computed, and that is the rule which measures it by miles or leagues; that the scale for its admeasurement can be applied only as the discretion of the judiciary may determine, upon its necessity or policy, irrespective of the Constitution, the statute, or the character of the element on which it is to be exerted, or the adjudications of this court on this last point.  That the admiralty of the fixed and limited realm of England, and as known to the framers of the Constitution, cannot be the admiralty of this day; and, of course, the admiralty of our time and of our present day must be changed according to the judgment or discretion of the courts, in the event of further acquisitions of territory.

Such are the conclusions regularly deducible from the opin-

ion of this court in the case of the Genesee Chief—conclusions, in my deliberate judgment, the most startling and dangerous innovations, anterior to that decision, ever attempted upon the powers and rights of internal government appertaining to the States. Speaking of the case of Waring *v.* Clark, the court say, p. 456 of 12 How.: "The majority of the court thought there was sufficient proof of *tide* there, and consequently it was not necessary to consider whether the admiralty power extended higher. But that case showed the unreasonableness of giving a construction to the Constitution which would measure the jurisdiction of the admiralty by the *tide.*" It may, I think, be here pertinently inquired, whether the natural and appropriate limit of a jurisdiction, admitted by all to be *maritime,* can be the more reasonably measured by the element on which alone that jurisdiction is authorized to act, for which alone existence has been given it, or by an indefinite, arbitrary, and mutable mathematical or geographical extension? Again, it is said by the court, (p. 457,) speaking of the limitation resulting from the character of the river: "If such be the construction, then a line drawn across the river Mississippi would limit the jurisdiction, although there were ports of entry above it, and water as deep and navigable, and the commerce as rich and exposed to the same hazards and incidents as the commerce below." If the experience of a pretty long official life had not familiarized me with instances, unhappily not a few, in which the meaning and objects of the Constitution and the just influence of the actually surrounding condition of the country when that instrument was framed have been lost sight of or made to yield to some prevailing vogue of the times, I confess that some surprise would have been felt at the seeming forgetfulness of the court in giving utterance to the expressions above quoted, of the facts, that when the Constitution was adopted, there was no such navigation as that on the Mississippi then known—no such river was then possessed by the United States; that the Constitution was formed by, and for, a coexisting political and civil association; was designed to be adapted to that state of things; and was in itself complete, and fully adapted to the ends and subjects to which it was intended to be applied. And but for the reason or the examples above referred to, the greater surprise would have been awakened by the disregard manifested, in the reasoning of the court, to this great fundamental principle of republican government, that if the Constitution was, at the period of its adoption, or has since, by the mutations of time and events, become inadequate to accomplish the objects of its creation, it belongs exclusively to those who formed it, and in whom resides the right to alter or abolish it,

to remedy its defects. No such power can exist with those who are the creatures of the Constitution, clothed with the humbler office of executing the provisions of that instrument. Suppose, at the time of its adoption, the Constitution was universally believed to be defective, in many respects essentially defective, would such a conviction have rendered it less the Constitution? Would it have lessened in any degree the obligation of obedience to it, or changed the power whence a remedy for its defects was to be derived? Could the judiciary, without usurpation, have essayed such a remedy? It is conceded by the court, that at the time of forming the Constitution the admiralty jurisprudence of England was the only system known and practiced in this country; it is admitted, also, that the English system was limited in theory and practice to the ebb and flow of the tide. It is further admitted, that at the time the Constitution was adopted, and our courts of admiralty went into operation, the definition which had been adopted in England *was equally proper here.* These admissions form a virtual surrender of anything like a foundation on which the decision of the court could be rested, either in the case of the Genesee Chief or in this case depending on that alone. For, if it be admitted that at the time of the adoption of the Constitution the admiralty rule in England limited the jurisdiction to *tide-waters,* and that the same rule was adopted and was *proper here,* it follows, by inevitable induction, that the jurisdiction intended to be created by the Constitution was that which was the only one then known, and which, in the language of this court, was *then proper here,* (as the Constitution cannot be supposed to establish anything unauthorized or improper,) and necessarily was complete, and adapted to the existing state of things. And this inquiry, therefore, forces itself upon us, viz: if the system was thus limited, and was known to be so by the framers of the Constitution, and if this instrument was designed to be applicable to the existing state of things, and was complete in itself, in all its delegations of and restrictions upon power, where is to be sought the right or power to enlarge or to diminish the effect or meaning of the instrument to make it commensurate with a predicament or state of things not merely *not existing* when the Constitution was framed, but which was not even within the contemplation of those by whom it was created? Such a power could not exist in the legislature, the only branch of the Government on which anything like a faculty to originate measures was conferred; much less could it be claimed by functionaries who have not, and rightfully cannot have, any creative faculties, but whose capacities and duties are restricted to an interpretation of the

Constitution and laws as they should have been fairly expounded at the times of their enactment.

But the court, after having declared the correctness of the English rule and its adoption here, go on to say, nevertheless, "that a definition which would *at this day* limit public rivers to *tide-water rivers* is wholly inadmissible." And why? Because the Constitution, either by express language or by necessary implication, recognises or looks to any change or enlargement in the principles or the extent of admiralty jurisdiction? Oh, no! For no such reason as this. "But we have *now* (say the court) thousands of miles of public navigable water, including lakes and rivers, in which there is no tide." Such is the argument of the court, and, correctly interpreted, it amounts to this: The Constitution, which at its adoption suited perfectly well the situation of the country, and which *then* was unquestionably of supreme authority, we now adjudge to have become unequal to the exigencies of the times; it must therefore be substituted by something more efficient; and as the people, and the States, and the Federal Legislature, are tardy or delinquent in making this substitution, the duty or the credit of this beneficent work must be devolved upon the judiciary. It is said by the court, "that there is certainly no reason for admiralty power over a public tide-water, which does not apply with equal force to any other public waters used for commercial purposes." Let this proposition be admitted literally, it would fall infinitely short of a demonstration, that because the Constitution, adequate to every exigency when created, did not comprise predicaments not then in existence or in contemplation, it can be stretched, by any application of judicial torture, to cover any such exigency, either real or supposed. This argument forcibly revives the recollection of the interpretation of the phrase "*necessary and proper*," once ingeniously and strenuously wielded to prove that a bank, incorporated with every faculty and attribute of such an institution, was not in reality, nor was designed to be, a *bank;* but was essentially an agent, an indispensable agent, in the administration of the Federal Government. And with reference to this doctrine of necessity, or propriety, or convenience, it may here be remarked, that it is as gratuitous and as much out of place with respect to the admiralty jurisdiction, as it was with respect to the Bank of the United States—perhaps still more so; as it is certain, and obvious to every well-informed individual, that, with the exception of some of the lakes, there is not a watercourse in the country, situated above the ebb and flow of the tide, which is not bounded on one or on both its margins by some county. And in the case before us, it is alleged expressly

in the pleading, and admitted throughout, that every fact in reference thereto transpired upon an inland water of the State of Alabama, two hundred miles above the tide, and within the county of Wilcox, in that State. And by adhering to what is an essential test of the admiralty jurisdiction in England, and formerly adopted and practiced upon in this country, there will be obtained a standard as to that jurisdiction, far more uniform and rational than that furnished by the tides. I allude to the rule which repels the pretensions of the admiralty whenever it attempts to intrude them *infra corpus comitatus.* This is the true rule as to jurisdiction, as it is susceptible of certainty, and concedes and secures to each system of jurisprudence, that of the admiralty and of the common law, its legitimate and appropriate powers. For this plain and rational test, this court now attempts to substitute one in its nature vague and arbitrary, and tending inevitably to confusion and conflict. It is now affirmed, that the jurisdiction and powers of the admiralty extend to all waters that are *navigable* within or without the territory of a State. In quest of certainty, under this new doctrine, the inquiry is naturally suggested, what are navigable waters? Will it be proper to adopt, in the interpretation of this phrase, an etymological derivation from *navis,* and to designate, as navigable waters, those only on whose bosoms ships and navies can be floated? Shall it embrace waters on which sloops and shallops, or what are generally termed river craft, can swim; or shall it be extended to any water on which a batteau or a pirogue can be floated? These are all, at any rate, *practicable* waters, navigable in a certain sense. If any point between the extremes just mentioned is to be taken, there is at once opened a prolific source of uncertainty, of contestation and expense. And if the last of these extremes be adopted, then there is scarcely an internal water-course, whether in its natural condition, or as improved under the authority and with the resources of the States, or a canal, or a mill-pond, some of which are known to cover many acres of land, (and, as this court can convert rivers without tides into *seas,* may be metamorphosed into small lakes,) which would not by this doctrine be brought within the grasp of the admiralty. Some of our canals are navigated by steam, and some of them by sails; some of them are adjuncts to rivers, and form continuous communications with the ocean; all of them are fed by, and therefore are made portions of, rivers. Under this new regime, the hand of Federal power may be thrust into everything, even into a vegetable or fruit basket; and there is no production of a farm, an orchard, or a garden, on the margin of these water-courses, which is not liable to be arrested on its way to the next

market town by the *high admiralty power*, with all its parade of appendages; and the simple, plain, homely countryman, who imagined he had some comprehension of his rights, and their remedies under the cognizance of a justice of the peace, or of a county court, is now, through the instrumentality of some apt fomenter of trouble, metamorphosed and magnified from a country attorney into a proctor, to be confounded and put to silence by a learned display from Roccus de Navibus, Emerigon, or Pardessus, from the Mare Clausum, or from the Trinity Masters, or the Apostles.

A citizen of any State of this Confederacy, bound as he is by habit, by affection, and fealty, to the soil and the institutions of his fathers, upon whom this magnificent machinery is brought to bear, (especially when recollecting by whom, and for whose sole benefit, this Confederacy was created,) may, as I have often done when contemplating the ceaseless march of central encroachment, be led to a tone of reflection like the following:

> "Urbem quam Romam dicunt putavi,
> Stultus ego, huic nostrae similem,
> Verum haec tantum, alias inter caput extulit urbes,
> Quantum lenta solent inter viburna cupressi."

Few, comparatively, of the attributes of sovereignty and equality, presupposed to have existed in those by whom the Federal Government was created, have remained perfectly intact and exempt from aggression by their own creature; and by no conceivable agency could they be more fearfully assailed than by this indefinite and indefinable pretension to admiralty power, which, spurning the restraints prescribed to it by the wise caution of our own ancestors, challenges, as occasion suits, the opinions and practices of all nations, people, and tongues, however diverse or incongruous with the genius of our own institutions.

Not the least curious circumstance marking this course, is the assertion, that it produces equality amongst all the citizens of the United States. Equality it may be, but it is equality of subjection to an unknown and unlimited discretion, in lieu of allegiance to defined and legitimate authority.

In truth, the extravagance of these claims to an all-controlling central power, their utter incongruity with any just proportion or equipoise of the different parts of our system, would exhibit them as positively ludicrous, were it not for the serious mischiefs to which, if tolerated, they must inevitably lead— mischiefs which should characterize those pretensions as fatal to the inherent and necessary powers of self-preservation and internal government in the States; as at war with the inter-

ests, the habits and feelings of the people, and therefore to be reprobated and wholly rejected. For myself, I can only say, that to whatsoever point they may, under approbation here or elsewhere, have culminated, they never can offer themselves for my acceptation, but they must encounter my solemn rebuke.

Mr. Justice CAMPBELL dissenting:

I dissent from the judgment of the court in this cause, and from the opinion delivered by the judges composing a majority of the court.

The judgment of the District Court affirms that the court had no jurisdiction as a court of admiralty, under the Constitution and laws of the United States, in a cause of collision arising in Wilcox county, in the State of Alabama, between steamboats navigating the Alabama river. The Alabama river flows entirely within the State, and discharges itself into the Mobile river, and through that and the Mobile bay connects with the Gulf of Mexico. The collision occurred two hundred miles above the ebb and flow of the tide, and on a river upon which no port of entry or delivery before that time had been established. This court decides that the judgment shall be reversed, and that the District Court shall take cognizance of the cause, against its own sense of obligation and duty.

It is my opinion that this court claims a power for the District Court not delegated to the Federal Government in the Constitution of the United States, and that Congress, in organizing the judiciary department, have not conferred upon any court of the United States. That this court has assumed a jurisdiction over a case only cognizable at the common law, and triable by a jury; and that its opinion and judgment contravene the authority and doctrine of a large number of decisions pronounced by this court, and by the Circuit Courts, after elaborate arguments and mature deliberation, and which for a long period have formed a rule of decision to the court, and of opinion to the legal profession; and that no other judgment of this court affords a sanction to this. (10 Wheat., 428; 7 Pet., 324; 11 Pet., 175; 12 Pet., 72; 5 How., 441; 6 How., 344; 4 Dall., 426; 2 Gall., 398; The Anne, 1 Mas., 109; 1 Bald., 544.)

The judicial power of the United States extends to all cases in law and equity arising under the Constitution and laws of the United States, and treaties made, or which shall be made, under their authority—to all cases of admiralty and maritime jurisdiction. Whatever other jurisdiction is allowed to the judiciary department is particular in its nature, depending upon the character or status of the persons or communities

who are parties to the controversy, and not upon the subject-matter. This classification of the cases to which the judicial power of the United States should extend among courts of law, equity, and of admiralty and maritime jurisdiction, refers to a division recognised in the jurisprudence of all the States that were parties to the Federal compact, and is intimately related to the constitutional history of the colonies and of the mother country. Neither at the Declaration of Independence by the Colonies, nor when the Federal Constitution was adopted, was there a body of municipal law common to the States, nor a uniform system of judicial procedure in use in their courts. Until the Constitution was framed, the States preserved their sovereignty, freedom, and independence, and every power, jurisdiction, and right, which had not been expressly delegated to the United States in Congress assembled.

Whatever reference is made in the Federal Constitution to any existing system of law, or any modes of judicial proceeding, as the basis of a distribution of power and authority, relates to the system thus recognised as existing in the several States as it was received from England.

A portion of that judicial system was esteemed of such vital importance to the liberty of the citizen, that it was incorporated into the Constitution of the United States, and placed above the reach of the authority of any department of the Federal Government. The sections of the Constitution, "that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of the grand jury; that, in all criminal prosecutions, the accused shall enjoy the right of trial by an impartial jury of the State and district wherein the crime shall have been committed," and "be informed of the nature and cause of his accusation;" "that in suits at common law, when the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved;" "that no person shall be deprived of life, liberty, or property, without due process of law;" and others of a like kind, identify the men of the Revolution as the descendants of ancestors who had maintained for many centuries a persevering and magnanimous struggle for a constitutional Government, in which the people should directly participate, and which would secure to their posterity the blessing of liberty. The supremacy of those courts of justice that acknowledged the right of the people to share in their administration, and directed their administration according to the course of the common law, in all the material subjects of litigation—of that common law which sprung from the people themselves, and is legitimate by that highest of all sanctions, the consent of those

who are submitted to it—of that common law, which resulted from the habitual thoughts, usages, conduct, and legislation, of a practical, brave, and self-relying race—was established in England and in the United States only by their persevering and heroic exertions and sacrifices. Magna Charta, from which a portion of this Constitution was extracted, was, according to Lord Brougham, "a declaration of existing and violated rights." It was renewed thirty times. To preserve its authority, it was read in churches, published four times a year in the county courts, sustained by force of arms, and when violated, the commons vindicated it by the infliction of exemplary punishment upon the guilty authors. A delinquent King at one time was required to imprecate the wrath of Heaven on those who transgressed it. The archbishop and bishops, apparelled in their official robes, with candles burning; "did excommunicate, accurse, and from the threshold of the church cut off all those who, by any art or device, shall violate, break, lessen, or change, secretly or openly, by deed, word, or counsel, against it, in any article whatsoever, and all those that against it shall make statutes, or observe them being made, or shall bring in customs, or keep them when they be brought in, and the writers of such statutes, and also the counsellors and executioners of them, and all those that shall presume to judge according to them."

The old historian, who describes this solemn ceremony, says, "that when this imprecation was uttered, and when the candles extinguished had been hurled upon the ground, and the fumes and stench rose offensive to the nostrils and eyes of those who observed it, the archbishop cried, "Even so let the damned souls be extinguished, smoke, and stink, of all who violate this charter or unrighteously interpret it."

The reign of Richard II was an epoch to be remembered with interest, and studied with care, by those concerned in administering the constitutional law of England or the United States. A formal complaint was made by the Commons of defects in the administration, as well about the King's person and his household as in his courts of justice, and redress was demanded. Measures were taken for placing the judicial institutions of England upon a solid constitutional foundation, and to exclude from the realm the odious systems of the continent. The first of the enactments was directed against the usurpations of the great military officers, who administered justice by virtue of their seignoral powers—the Lords' Constable and the Earl Marshal. The acts of 8th and 13th Richard II provide that, "because the Commons do make a grievous complaint that the court of the Constable and Marshal have ac

croached to them, and do daily accroach, contracts, covenants, trespasses, debts, detinues, and many other actions pleadable at the common law, in great prejudice to the King, and to the great grievance and oppression of the people," therefore they were prohibited, and their jurisdiction confined "to contracts and deeds of arms without the realm," and "things that touch more within the realm which cannot be determined and discussed by the common law."

The Lord High Admiral received a similar rebuke. The preamble of the act of 13 Richard II recites, "that complaints had arisen because Admirals and their deputies hold their sessions within divers places of the realm, accroaching to them greater authority than belonged to their office, to the prejudice of the King, &c." It was declared that the Admiral should not meddle with anything done within the realm, but only with things done upon the sea, as had been used in the time of Edward III. But this did not suffice to restrain the accroaching spirit of that feudal lord and his deputies.

Two years after, the Parliament enacted, "that the court of admiralty hath no manner of cognizance, power, nor jurisdiction of any manner of contract, plea, or quarrel, or of any other thing done or rising within the bodies of counties, either by land or water, and also with wreck of the sea; but all such manner of contracts, pleas, and quarrels, and all other things rising within the bodies of counties, as well by land as by water as aforesaid, and also wreck of the sea, shall be tried, termined, discussed, and remedied by the laws of the land, and not before, nor by the Admiral or his lieutenant, in no manner. Nevertheless, of the death of a man and of a mayhem done in great ships, being and hovering in the main stream of the great rivers, beneath the points of the same rivers, and in no other place of the same rivers, the Admiral shall have cognizance."

In the sixteenth year of the reign of Richard II, the rule of the Roman chancery, like that of the Lords' Constable, Marshal, and Admiral, was banished from England. In that year it was enacted that, "Both those who shall pursue or cause to be pursued, in the court of Rome or *elsewhere*, any processes, or instruments, or other things whatsoever, which touch the King, against his crown and regality, or his realm, shall be outlawed and placed out of the King's protection." In the following reign the accroaching spirit of the courts of admiralty received a further rebuke.

Upon the prayer of the Commons, the statutes of Richard II were confirmed, and a penalty was inflicted upon such as should maintain suits in the admiralty, contrary to their spirit.

This body of statute law served in a great degree to check

the usurping tendencies of these anomalous jurisdictions, and to prevent in a measure the removal of suits triable at the common law *ad aliud examen*, and to be discussed *per aliam legem*. It placed upon an eminence the common law of the realm, and enabled the Commons to plead with authority against other encroachments and usurpations upon the general liberty. But, though a foreign law and despotism were not allowed to enter the kingdom through the courts martial, ecclesiastical, or admiral, the perversion of judiciary powers to purposes of oppression was not effectually prevented. The courts of the Star Chamber and of High Commission, originally limited to specific objects, "assumed power to intermeddle in civil causes and matters only of private interest between party and party, and adventured to determine the estates and liberties of the subject, contrary to the law of the land and the rights and privileges of the subject," and "had been by experience found to be an intolerable burden, and the means to introduce an arbitrary power and government." Among the cases of jurisdiction claimed by the Star Chamber were those between merchant strangers and Englishmen, or between strangers, and for the restitution of ships and goods unlawfully taken, or other deceits practiced on merchants.

One of the most practiced proctors of this court has left his testimony: "That since the great Roman Senate, so famous in all ages and nations as that they might be called *jure mirum orbis*, there hath no court come so near them, in state, honor, and adjudication, as this." But, by the 16th of Charles I, it was enacted, both in respect of this and the High Commission Court, "that from henceforth no court, council, or place of judicature, shall be erected, ordained, constituted, or appointed, which shall have, use, or exercise the same or like jurisdiction as is or hath been used, practiced, or exercised," in those courts.

But the statute did not terminate with this. The patriot leaders of that time, reviewing in the preamble to the act the various parliamentary enactments in regard to the legal institutions of England, and reciting those declarations of the public liberties which had extended over a period of four hundred years, proceeded to add another. It was solemnly enacted, "that neither his Majesty, nor his Privy Council, have, or ought to have, any jurisdiction, power, or authority, by English bill, petition, articles, libel, or any other arbitrary whatsoever, to examine or draw in question, determine, or dispose of the lands, tenements, hereditaments, goods, and chattels, of any of the subjects of this realm, but that the same ought to be tried and determined in the ordinary courts of justice, and by the ordinary course of the law."

This selection of a few sections from various English statutes, and the historical facts I have mentioned, is designed to illustrate the intensity and duration of the contest which resulted in placing the judiciary institutions of England on their existing foundation. In the midst of that contest, the settlements were formed in America in which those institutions were successfully planted.

They have been incorporated into the Constitution of the United States, and prevail from the Atlantic Ocean to the Pacific, and from the Lakes to the Gulf of Mexico. These statutes show how the courts martial, ecclesiastical, admiral, and courts proceeding from an arbitrary royal authority, were either limited or suppressed.

The inquiry arises, how would a case like that before this court have been decided in England, either at the period of the Declaration of Independence, or at the adoption of the Constitution of the United States, in the court of admiralty?

In 1832 a question arose in that court, whether a cause of collision, arising between steam vessels navigating the river Humber, a short distance from the sea, within the ebb and flow of the tide, within the port of Hull, below the first bridges, when the tide was three-fourths flood, was cognizable by the court. The judge of the admiralty, an exact and conscientious judge, answered: "Since the statutes of Richard II and of Henry IV, *it has been strictly held* that the court of admiralty cannot exercise jurisdiction in civil causes arising *infra corpus comitatus.*" I cite this opinion not simply as evidence of the law in 1832, but also as affording authentic evidence of the historical fact it enunciates. (The Public Opinion, 2 Hagg., 399.)

I proceed now to inquire of the admiralty jurisdiction as exercised by the courts of vice-admiralty in the colonies and in the United States before the adoption of the Constitution.

The jurisdiction included four subjects, and a separate examination of each title of jurisdiction will shed light upon the discussion. These are—prize; breaches of the acts of navigation, revenue, and trade; crimes and misdemeanors on the high seas; and cases of civil and maritime jurisdiction.

The prize jurisdiction originated in a special commission from the King, and is usually conferred at the commencement of hostilities, upon the Admiral and his subordinates. It is a part of the ancient jurisdiction of the court, as thus derived. Congress, by the Articles of Confederation, were authorized to appoint courts of appeal to determine finally upon cases of that kind, and no doubt has ever been expressed that this branch of jurisdiction, under the Constitution and acts of Congress

since the adoption of the Constitution, is vested in the District Courts of the United States. (The Hunter, 1 Dod., 483; Le Coux *v.* Eden, 2 Doug., 613; 13 How., 498; 2 Gall., 325; ib., 20.)

The admiralty court of Great Britain and the vice-admiralty courts of the colonies were vested with jurisdiction over cases for the violation of a series of statutes for the regulation of trade and revenue in the colonies. The origin and extent of this jurisdiction are explained in the case of the Columbus, decided in the British admiralty in 1789, on an appeal from the vice-admiralty court of Barbados. The learned judge of that court said: "The court of admiralty derives no jurisdiction in causes of revenue from the patent of the judge, or from the ancient customary and inherent jurisdiction of the prerogative of the Crown, in the person of its Lord High Admiral, and exercised by his lieutenant. Not a word is mentioned of the King's revenue, which seems to have been entirely appropriated to the Court of Exchequer, which is both a court of law and equity. If, therefore, there is any inherent prerogative right of judging of seizures upon the sea, for the rights and dues of the Crown, whether of peace or of war, as in the right of prize and reprisal, that prerogative jurisdiction is put in motion by special commission or by act of Parliament. The first statute which places judgment of revenue in the plantations with the courts of admiralty, is the 12th of Charles II, ch. 18, sec. 1, which act has been followed by subsequent statutes." This lucid opinion has not been cited in any previous discussion of the subject in this court, from the fact that it is not published in the regular series of the admiralty reports. (2 Coll. Jur., 82; 2 Dod. Adm. R., 352.)

By an act of the 22d and 23d Charles II, to regulate the trade of the plantations, suits were authorized for breaches of its enactments "in the court of the High Admiral of England, or of any of his vice-admirals," or in any court of record. The acts of 7th and 8th of William III, 6th George II, 4th, 5th, 6th, 7th, and 8th, of George III, confer plenary jurisdiction upon the same courts, in cases of navigation, trade, and revenue, in the colonies, and the later statutes extend their authority to seizures upon the land as well as water. The reason for this jurisdiction, as given in the acts themselves, and as repeated by British writers, is not creditable to the colonists; but, as Justice Chase has assigned in this court a similar reason for the acts of Congress on the same subject, no offence can be taken for repeating the British opinion. Reeves, in his History of Navigation and Shipping, says: "The laws of navigation were nowhere disobeyed and contemned so openly as in New Eng-

land;" "that, in minds tempered as theirs were, obedience. and disobedience were much the same thing to the interests of the mother country;" "that the contraband trade was carried on with skill and courage;" "that the exclusion of all but native subjects of Great Britain from serving on juries afforded no corrective;" "that for the purpose of securing the execution of the acts of trade and navigation, the Government proceeded to institute courts of admiralty, and to appoint persons to the office of attorney general in those plantations where such courts and such offices had never before been known; and from this time there seems to have been a more general obedience to the acts of trade and navigation." (Reeves's Hist., 79, 90; Stokes's Const. Col., 360, 361.)

The first of these acts was passed when the colonial settlements in New England and Virginia were in their infancy, and before those in the remaining colonies had been fairly commenced. The jurisdiction was familiar to the colonists, and these acts explain the origin of the clause of the judiciary act of 1789 on the same subject. The judiciary act confers on the District Courts "cognizance of all civil causes of civil and maritime jurisdiction, including all seizures under laws of impost, navigation, or trade, of the United States, when the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas." It is difficult to comprehend on what principle the court can construe the grant of jurisdiction in this act over cases of seizure under the law of impost and trade upon navigable waters, to an extension of the civil jurisdiction of the admiralty to the same localities. The admiralty jurisdiction, in cases of seizure, is a special jurisdiction, not belonging to the original constitution of the courts of admiralty, and this act treats it as such. And so this court, until the revolution in its doctrines in these latter years, uniformly treated it. The long and painful discussions from Delovio v. Boit to the New Jersey Navigation Case, are without meaning on any other hypothesis. If the jurisdiction in both classes of cases had been supposed to rest on the same foundation, the whole controversy would have been settled by the case of "La Vengeance," reported in 3 Dall., 297.

The civil and maritime jurisdiction of the vice-admiralty courts extended to the same subjects and was exercised under the same limitations in the colonies as in Great Britain. "Upon the establishment of colonial Governments," says a learned judge of one of those courts, "it was deemed proper to invest the Governors with the same civil and maritime jurisdiction; and therefore it became usual for the Lord High Admiral or the

Lords Commissioners to grant a commission of vice-admiral to them." The office thus conferred on the Governor was precisely the same with that of the vice-admirals in England, and was confined to that civil and maritime jurisdiction which was the original branch of his authority. (Stewart's V. Ad. R., 394, 405.) These courts were subordinate to the admiralty court of England, and, until the late reign of William IV, it received appeals from them. (1 Dod. Adm. R., 381.) The incompatibility of the criminal jurisdiction of the Admiral on the high seas with the legal constitution of England, was declared and corrected by the 28 H. VIII, ch. 15.

Hawkins, in his Pleas, says that, it being inconsistent with the liberties of the nation that any man's life should be taken away, unless by the judgment of his peers or the common law of this land, that act was passed. (1 Hawk. Pl., 251.) And the same principle is embodied in the Constitution of the United States, with much enlargement; for the extension of the admiralty jurisdiction under the laws, professedly of navigation and trade, for the punishment of offences and misdemeanors, in the reign of George III, was a prominent cause of the American Revolution. In 1768, John Adams, the Coke of the Revolution, prepared for the citizens of Boston instructions to their representatives, Otis, Cushing, Samuel Adams, and Hancock. The citizens said to their representatives, that, "next to the revenue itself, the late extensions of the jurisdiction of the admiralty are our greatest grievance. The American courts of admiralty seem to be forming by degrees into a system that is to overturn our constitution, and to deprive us of our best inheritance, the laws of the land. It would be thought in England a dangerous innovation, if the trial of any matter on land was given to the admiralty." They refer to the statutes passed in the reign of George III, and declare that they violate Magna Charta; and they conclude by an earnest recommendation to their representatives, " *by every legal measure to endeavor that the power of these courts may be confined to their proper element, according the ancient English statutes ;* and that they petition and remonstrate against the late extensions of their jurisdictions, and they doubt not that the other colonies and provinces, who suffer with them, will cheerfully harmonize with them in any justifiable measures of redress." Other testimony of the same kind might be adduced, to show what the opinions of the colonists were, as to the legitimate extent of the admiralty jurisdiction in the colonies. The journals of the First Congress (1774) render this unnecessary. They are replete with proof of the pervading sentiment in the British colonies.

That Congress declare that "the respective colonies are entitled to the common law of England, and to the benefit of such English statutes as existed at the time of the colonization, which had been found suitable to their situation." In their address setting forth the cause and necessity for their taking up of arms, they allege that statutes have been passed for extending the jurisdiction of courts of admiralty beyond their ancient limits. In the several addresses to the inhabitants of Great Britain, to the people of the colonies, to the people of Ireland, and to the King, the enlarged authority of those courts, their interference with the common-law right of trial by jury, and their offensive use of the laws and course of proceeding adopted from Roman tyrants, are distinctly reprehended. (1 Jour. Congr., 16, 28, 32, 47, 101.)

There can be no room for doubt that the statesmen and jurists who composed the Congress of 1774 regarded the limits of the courts of admiralty as settled by the statutes of Richard II, Henry IV, Henry VIII, and the early acts of navigation and trade, and that the enlargement of this jurisdiction was such a wrong as to justify a resort to arms. Their declarations bear no other interpretation; and the admiralty system of the States before the Constitution was administered upon this opinion. (Bee's Adm. R., 419, 433; 1 Dall., 33.)

Before examining the constitutional history and Constitution of the United States, it will not be irrelevant to ascertain the origin of the courts of admiralty in France, and their jurisdiction at the period of the adoption of the Constitution. The Admiral was, in France, as in England, a great feudatory, with the seignoral privilege of administering justice by judges of his appointment. There were there, as in England, contests with other officers in regard to jurisdiction, and the royal authority was interposed to settle them. In 1627, the office, with its dignity and privileges, was abolished; in 1668, it was revived by Louis XIV, and conferred upon a member of the royal family; in 1791, it was suppressed, and its judicial establishment disappeared from history, other courts and authorities being established to perform their functions. The ordinances of Louis XIV enlarged and defined the jurisdiction of the courts of the Admiral, to promote the convenience of commerce, to determine the unsettled jurisprudence concerning maritime contracts, to define the duties of seamen, the powers of the officers, and to provide an adequate police for the ports, harbors, and the coasts of the sea.

Their jurisdiction extended to a number of cases of contract specified in the ordinance, and conferred the ancient jurisdiction over piracies and thefts at sea, the desertion of crews, and

generally of all crimes, offences, and trespasses, committed on the sea, in ports, roadsteads, and havens, and the shores within the ebb and flow of the tide.

The police and navigation of the rivers of France were not placed under the admiralty, but were regulated by other officers under other ordinances. Without supposing that the ordinances of Louis XIV have any authority on this subject, it is yet certain that a cause of collision arising upon one of the rivers of France above the ebb and flow of the tide was not cognizable before the admiralty of France, in 1789, or for centuries previously.

The judicial power of the United States was organized to comprehend all cases that might properly arise under the Constitution, laws, and treaties of the United States, and, in addition, cases of which, from the character of the parties, the decision might involve the peace and harmony of the Union. This principle was accepted without dissent among the framers of the Constitution. The clause "all cases of admiralty and maritime jurisdiction" appears in the draught of the Constitution imputed to Charles Pinckney, and submitted at a very early stage of the session of the Convention. It was reported by the committee of detail in their first report, and was adopted without debate. In one of the sittings, in an incidental discussion, Mr. Wilson, of Pennsylvania, remarked: "*That the admiralty jurisdiction ought to be given wholly to the National Government, as it related to cases not within the jurisdiction of a particular State*, and to a scene *in which controversy with foreigners would be most likely to happen.*" (2 Mad. De., 799.) No other observation in the Convention illustrates this clause.

The judiciary clause is expounded in the numbers of the Federalist, by Alexander Hamilton.

He says, the judicial power extends—1st, to all those cases which arise out of the laws of the United States, passed in pursuance of their just and constitutional powers of legislation; 2d, to all those which concern the execution of the provisions expressly contained in the Articles of Union; 3d, to all those in which the United States are a party; 4th, to all those which involve the peace of the Confederacy, whether they relate to the intercourse between the United States and foreign nations, or to that between the States themselves; 5th, to all those which originate on the high seas, and are of admiralty or maritime jurisdiction; and, lastly, to all those in which the State tribunals cannot be supposed to be unbiassed and impartial.

In regard to the 5th class, he says: "The most bigoted idolizers of State authority have not thus far shown a disposition to deny the national judiciary the cognizance of maritime

causes. These so generally depend on the laws of nations, and so commonly affect the rights of foreigners, that they fall within the considerations relative to the public peace. The most important of them are, by the present Confederation, submitted to Federal jurisdiction."

Similar remarks are to be found in the debates in various of the Conventions of the States which adopted the Constitution, as incidentally occurring. In none of the Conventions was the judiciary clause of the Constitution considerately examined, except in Virginia; and in the Convention of Virginia no objection was made to this clause. Gov. Randolph said there, that "cases of admiralty and maritime jurisdiction cannot with propriety be vested in particular State courts. As our national tranquillity, reputation, and intercourse with foreign nations, may be affected by admiralty decisions, as they ought therefore to be uniform, and as there can be no uniformity if there be thirteen distinct independent jurisdictions, the jurisdiction ought to be in the Federal judiciary." Mr. Madison, in a luminous exposition of the article, expressed a similar opinion. He said: "The same reasons supported the grant of admiralty jurisdiction as existed in the grant of cognizance of causes affecting ambassadors and foreign ministers." "As our intercourse with foreign nations will be affected by decisions of this kind, they ought to be uniform." In the same speech, this statesman affirmed, *that all controversies directly between citizen and citizen will still remain with the local courts.* And after the Constitution was adopted, we find Chief Justice Jay, in analyzing the judicial power of the United States, and assigning reasons for the grant, says of this portion of it, "because, as the seas are the joint property of nations, whose rights and privileges relative thereto are regulated by the law of nations and treaties, such cases necessarily belong to a national jurisdiction." The instance jurisdiction of the court, now the object of such ambition and interest, and involving questions so threatening, was hardly referred to by the friends of the Constitution, and not an alarm was expressed by any of its vigilant and jealous opponents. The prize jurisdiction of the court—that which concerned the foreign relations of the Union in war or in peace, and which is so intimately related to the honor and dignity of the country—was in the minds of all those statesmen who referred to the subject.

It did not enter the imagination of any opponent of the Constitution to conceive that a jurisdiction which for centuries had been sternly repelled from the body of any county could, by any authority, artifice, or device, assume a jurisdiction through the whole extent of every lake and water-course within the

limits of the United States. The collision described in the libel of the appellants occurred at a place which in 1789 formed a part of the State of Georgia. Had a similar cause then arisen, I can affirm with perfect safety that not an individual member of any Convention, whether State or Federal, who was concerned in the making or the ratifying of the Constitution, would have admitted the existence of an admiralty jurisdiction over the case. Such being the facts, I affirm that no change in the opinion of men, nor in the condition of the country, nor any apparent expediency, can render that constitutional which those who made the Constitution did not design to be so.

"If any of the provisions of the Constitution are deemed unjust," said the Chief Justice, in Scott *v.* Sandford, 19 How., 393, "there is a mode prescribed in the instrument itself by which it may be amended; but, while it remains unaltered, it must be construed as it was understood at the time of its adoption. It is not only the same in words, but the same in meaning, and delegates the same powers to the Government, and secures the same rights and privileges to the citizen; and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning with which it spake when it came from the hands of its framers, and was voted on and adopted by the people of the United States.

That the framers of the Constitution designed to secure to the Federal Government a plenary control over all *maritime* questions arising in their intercourse with foreign nations, whether of peace or war, which assumed a juridical form through courts of its own appointment, is more than probable from the instrument and the contemporary expositions I have quoted. This was the primary and designed object of the authors of the Constitution in granting this jurisdiction. It is likewise probable that the jurisdiction which had been exercised from the infancy of the colonies to the reign of George III, by courts of admiralty, under laws of navigation, trade, and revenue, was considered as forming a legitimate branch of the admiralty jurisdiction. Such was the opinion of the First Congress under the Constitution, and it has been confirmed in this court. (3 Dall., 397; 2 Cr., 405; 4 Cr., 443; 2 H., 210.) If the instance jurisdiction of the court was at all remembered, the reminiscence was not of a nature to create alarm. The cases for its employment were few and defined. Those did not depend upon any purely municipal code, nor affect any question of public or political interest. They related for the most part to transactions at a distance, which did not involve the interests nor attract the observation of any considerable class of persons. No one could imagine that this jurisdiction,

by the interpretation of those who were to exercise it, could penetrate wherever a vessel of ten tons might enter within any of the States.

The question arises, what are the power and jurisdiction claimed for the courts of the United States by this reversal of the judgment of the District Court of Alabama?

The Supreme Court requires that court to take cognizance of cases of admiralty and maritime jurisdiction that arise on lakes and on rivers, as if they were high seas. Dunlap, defining the constitutional jurisdiction in 1835, said, that "it comprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all contracts, whensoever they may be made and executed, or whatever may be the form of the stipulation which relates to the navigation, business, or commerce of the sea." (Dunlap's Pr., 43.)

This was the broad pretension for the admiralty set up by Mr. Justice Story, in Delovio v. Boit, in 1815, under which the legal profession and this court staggered for thirty years before being able to maintain it. The definition to be deduced from the present decision deprives that of any significance. That affords no description of the subject.

The definition under this decree, if carried to its logical extent, will run thus: "That the admiralty and maritime jurisdiction of the courts of the United States extends to all cases of contracts, torts, and injuries, which arise in or concern the navigation, commerce, or business of citizens of the United States, or persons commorant therein, on any of the navigable waters of the world."

I proceed now to examine the jurisprudence of the courts of the United States, to ascertain the various stages in the progress to the goal which has been to-day attained. The tendency of opinion in the first years of the existence of the Union was to limit the admiralty jurisdiction according the constitution of the British court of admiralty. Justice Washington so declared in 1806; United States v. McGill, 4 Dall., 395; and his learned successor maintained the same doctrine. (Bald. R., 544.)

This opinion was assailed by Justice Story in Delovio v. Boit, 2 Gall., 395, in the year 1815.

The question of jurisdiction arose on a libel founded on a policy of insurance, and the jurisdiction of the court was sustained. I believe I express a general, if not universal, opinion of the legal profession, in saying that this judgment was erroneous. I understand Justice Curtis to intimate the existence of such an opinion in the Gloucester Insurance Company v. Younger, 2 Curt. R., 322.

The opinion of Justice Story, in the cause of Delovio *v.* Boit, is celebrated for its research, and remarkable, in my opinion, for its boldness in asserting novel conclusions, and the facility with which authentic historical evidence that contradicted them is disposed of. The examination of the English authorities resulted in the following conclusions.

In the construction of the statutes of Richard II and Henry IV, "the admiralty has *uniformly* and *without hesitation*," he says, "maintained that they were never intended to abridge or restrain the rightful jurisdiction of the court; that they meant to take away any pretence of entertaining suits upon contracts arising wholly upon land, and referring solely to terrene affairs; and upon torts or injuries which, though arising in ports, were not done within the ebb and flow of the tide; and that the language of these statutes, as well as the manifest object thereof, as stated in the preambles, and in the petitions on which they were founded, is fully satisfied by this exposition. So that, consistently with the statutes, the admiralty may still exercise jurisdiction: 1. Over torts and injuries upon the high seas, and in ports within the ebb and flow of the tide, and in great streams below the first bridges; 2. Over all maritime contracts arising at home or abroad; 3. Over matters of prize and its incidents." In regard to the conclusions of the courts of common law he says:

That the common-law interpretation of these statutes abridges the jurisdiction to things wholly done on the sea. 2. That the common-law interpretation of these statutes is indefensible upon principle, and the decisions founded upon it are inconsistent and unsatisfactory. 3. That the interpretation of the same statutes does not abridge any of its ancient jurisdiction, but leaves to it cognizance of all maritime contracts, torts, injuries, and offences upon the high seas, and in ports as far as the ebb and flow of the tide. 4. That this is the true limit of the admiralty jurisdiction, on principle. In regard to the case of the collision between ships and steamboats, we have the authoritative declaration of the judge of the admiralty. I have cited it to show that this statement of the English law is not accurate. And Sir John Nicholl, in the same court, in 3 Hagg., 257, 283, differs materially from other portions of the same statement. It may be true that the English court of admiralty, with the approbation of the King, took cognizance of causes arising within the limits of England, in despite of the prohibition by Parliament. But the great charter, and other statutes of importance to the liberties of the realm, were also violated by the same authority. It is also true that the twelve judges of England, and the attorney gen-

eral, in the presence of the King and the Privy Council, after solemn debate, in 1632, signed an agreement to concede to the admiralty a larger jurisdiction. But such an act was illegal, and by the judges extra-judicial. Ten of those judges, four years later, presided in the case against Hampden for ship money; the attorney general was the inventor of the writ for its levy; the Privy Council was that which Strafford and Laud had organized to rule England without a Parliament, and which was made hateful by its arbitrary and violent proceedings. And the contract itself was denounced as unconstitutional by Lord Coke, who, but a few years before, had prepared the Petition of Right in which the legal constitution of England was embodied. For all contracts, pleas, and quarrels, made and done upon a river, haven, or creek, within the realm of England, he said, "the Admiral, without question, hath not jurisdiction, for then he should hold plea of things done within the body of the county, which are triable by verdict of twelve men, and merely determinable by the common law, and not within the admiralty and by the civil law; for that were to change and alter the law in such cases." (4 Co. Inst., 135.) And finally, in 1640, to close the door upon all such attempts of the King and his Privy Council, the fifth section of the act "For the regulating of the Privy Council, and for taking away the court commonly called the Star Chamber," which I have already quoted, was adopted.

The great and controlling question of contest in this long period of contest was as to the supremacy of the Parliament, and a very important form of that question related to its organization of the courts and its regulation of their jurisdiction. When the supremacy of Parliament had been established by the Revolution, its enactments which had defined the constitutional limits of the courts of judicature were no longer opposed or contradicted. The error of the opinion in Delovio *v.* Boit, on this subject, in my judgment, consists in its adoption of the harsh and acrimonious censures of discarded and discomfited civilians on the conduct of the great patriots of England, whose courage, sagacity, and patriotism, secured the rights of her people, as any evidence of historical facts.

But the royal ordinances of Louis XIV unquestionably afford that support to the decision and opinion in that case which cannot be found in the English law. The policy of insurance is enumerated among the contracts submitted to the French courts of admiralty, and the formulary in which the jurisdiction as to torts and offences is expressed in the opinion is a free translation from the French ordinances. I refer to the opinion in the case of Delovio *v.* Boit, as the first and most complete

exposition of the system which its author afterwards introduced as the doctrine of the court, in.the Thomas Jefferson, in 1825; Orleans v. Phœbus, in 1837; and Coombs's case, in 1838; and which was more fully sanctioned in the opinions of the court .in subsequent cases; and because he defends in that opinion the jurisdiction of the admiralty upon grounds which are not to be reconciled with the opinion of the court in the present cause.

In the Steamboat Orleans v. Phœbus, 11 Pet., 173, decided in 1835, the court say: "The true test of jurisdiction is, whether the vessel be engaged substantially in maritime navigation, or in interior navigation and trade, not on tide-waters. In the latter case there is no jurisdiction." In the United States v. Coombs, 12 Pet., 73, the direct question arose as to the limits of this jurisdiction. The court answers, as in former cases, "That in cases purely dependent upon the locality of the act done, it is limited to the sea and to tide-waters as far as the tide flows; and that it does not reach beyond high-water mark. It is the doctrine repeatedly asserted by this court, and we see no reason to depart from it." In Waring v. Clark, 5 How., 441, the same question was again considered by the court. The claimants of the largest extent of jurisdiction for the court expressed their opinion through Mr. Justice Wayne. He cited the former decisions with approbation, and said that the question was no longer open in the court; "that it was *res judicata* in this court." Again, in 1848, Mr. Justice Nelson, expressing the views of the four judges who concurred with Justice Wayne in the former case, (New Jersey Steam Navigation Company v. Merchants' Bank, 6 How., 344,) disclaimed jurisdiction over "contracts growing out of the purely internal commerce of the State, as well as commerce beyond tide-waters," stating that "they are generally domestic in their origin and operation, and could hardly have been intended to be drawn within the cognizance of the Federal courts." I think it is manifest, that had the case before the court been produced before it ten years ago, it would have been unanimously dismissed for the want of jurisdiction. From the decision in the Thomas Jefferson, in 1825, to that of the New Jersey Navigation Company v. the Merchants' Bank, in 1848, two generations of judges have agreed to doctrines wholly irreconcilable with the judgment now given.

In 1851, the case of the Genesee Chief v. Fitzhugh, 12 How., 443, came before the court. It was a cause of collision between steamboats navigating Lake Ontario, and engaged in the commerce of different States. The District Court exercised jurisdiction under the act of February, 1845, (5 Stat. at L., 726,)

which provided for such cases on the lakes, and navigable waters connected with them, in the same manner as if the same vessels had been employed in navigating the high seas or on tide-waters within the admiralty jurisdiction, with a proviso that all the issues of fact might be tried by a jury.

The court decided that the act was not a regulation of commerce between the States, and that the jurisdiction conferred on the District Court could not be sustained as a regulation of commerce among the States, and that the judicial power of the United States could not be extended by such legislation. The court, after this sound constitutional argument, proceed to say: "If the meaning of these terms in the Constitution was now for the first time brought before this court, there could, we think, be no hesitation in saying that the lakes and their connecting waters were embraced in them. These lakes are, in truth, inland seas. Different States border on them on one side, and a foreign nation on the other; a great and growing commerce between different States and a foreign nation, which is subject to all the incidents and hazards that attend commerce on the ocean. Hostile fleets have encountered in them, and prizes have been made; and every reason which exists for the grant of admiralty jurisdiction to the General Government on the Atlantic seas, applies with equal force to the lakes. There is an equal necessity for the instance power, and for the prize power of the admiralty court to administer admiralty law; and if the one cannot be established, neither can be the other."

All the considerations mentioned in this argument applied to the Mississippi river in 1789, and some of them do at this time.

I have stated the entire argument of the court upon the precise question, whether the court had jurisdiction of the cause for damage in that locality. The court say, "the only objection made to the jurisdiction is, that there is no tide in the lakes, or the waters connecting them; and it is said that the admiralty and maritime jurisdiction, as known and understood in England and this country at the time the Constitution was adopted, was confined to the ebb and flow of the tide." The Chief Justice combats this objection to the jurisdiction of the court in that cause, and pronounces for the court that *tide* does not form the criterion of jurisdiction. In my opinion, the argument of the court in favor of jurisdiction is imposing; and also that the objection taken by the appellants, as reported in the opinion, does not embody the strength of the objection to the jurisdiction. To ascertain the scope of the opinion, it is necessary to examine the argument of the court, and the worth of the objection taken to the jurisdiction and combated.

The lakes are certainly not seas according to the signification of that word in the law of nations or the Admiral's commission. They are not common highways for all nations, open to the ships of all, and exempted from the municipal regulation and control of any. The sovereignty over them belongs to the riparian proprietors, in the same manner as over the Rhine or Rio Grande rivers; and the American States and British Queen have respectively courts to administer their laws within the limits of their several titles, to the middle of the lakes, against those who may offend against them. The jurisdiction of the court of admiralty cannot be supported upon the lakes as seas. But the lakes form an external maritime boundary of the United States, and are a commercial highway, which by treaty is common to the inhabitants of the two maritime and commercial countries whose possessions border them. The commerce of these countries is great and growing, and exposed to depredation; and in the absence of a navy, and without defined boundaries, the police of the States on this exposed frontier may be inefficient for the protection of the interests of the Union. I shall not inquire whether these considerations, or those among them which are applicable to the river Mississippi, authorized the decisions in the Genesee Chief *v.* Fitzhugh, 12 How.; and Fritz *v.* Bull, 12 How., 466; Walsh *v.* Rogers, 13 How., 283. I have yielded to the principle of *stare decisis*, and have applied the decisions as I found them when I came into this court. But not one of these considerations has any application to the case before this court. The Alabama river is not an inland sea. Its navigation was not open to a single foreign vessel when this collision took place. No port had been established on it by the authority of Congress. The commerce that passes over it consists mainly of the products of the State, and the objects received in exchange, at the only seaport of the State. For its whole length it is subject to the same State Government, and its police does not involve a necessity for a navy.

The objection noticed in the opinion of the court in the Genesee Chief, as opposed in the argument against the jurisdiction of the court, I have said does not meet the force of the adversary opinion. In France, the domain of the Admiral was limited to the sea, its coasts, ports, havens, and shores to the highwater mark, and his seignoral right to dispense justice was confined to his domain. The contest there was as to the extent of rival seignories. But in Great Britain the contest had a more profound significance than is to be found in a controversy merely between rival feudatories.

The Admiral's jurisdiction there had no relation to the salt-

ness or freshness of the waters, nor whether the rivers were public or private, navigable or floatable. The question was, whether Englishmen should be governed by English laws, or "whether contracts, pleas, and quarrels, should be drawn *ad aliud examen,* and be sentenced *per aliam legem.*" The English Commons abhorred the summary jurisdiction of the courts of civil law, their private examination of witnesses, their rejection of a jury of the vicinage, the discretion they allowed to the judge, and their foreign code. They erected a barrier of penal statutes to exclude them from the body of any county, either on land or water.

The people of the several States have retained the popular element of the judicial administration of England, and the attachment of her people to the institutions of local self-government. In Alabama, the "trial by jury is preserved inviolate," that being regarded as "an essential principle of liberty and free government." In the court of admiralty the people have no place as jurors. A single judge, deriving his appointment from an independent Government, administers in that court a code which a Federal judge has described as "resting upon the general principles of maritime law, and that it is not competent to the States, by any local legislation, to enlarge, or limit, or narrow it." (2 Story R., 456.)

If the principle of this decree is carried to its logical extent, all cases arising in the transportation of property or persons from the towns and landing-places of the different States, to other towns and landing-places, whether in or out of the State; all cases of tort or damage arising in the navigation of the internal waters, whether involving the security of persons or title to property, in either; all cases of supply to those engaged in the navigation, not to enumerate others, will be cognizable in the District Courts of the United States. If the dogma of judges in regard to the system of laws to be administered prevails, then this whole class of cases may be drawn *ad aliud examen,* and placed under the dominion of a foreign code, *whether they arise among citizens or others.* The States are deprived of the power to mould their own laws in respect of persons and things within their limits, and which are appropriately subject to their sovereignty. The right of the people to self-government is thus abridged—abridged to the precise extent, that a judge appointed by another Government may impose a law, not sanctioned by the representatives or agents of the people, upon the citizens of the State. Thus the contest here assumes the same significance as in Great Britain, and, in its last analysis, involves the question of the right of the people to determine their own laws and legal institutions. And surely this objec-

tion to the decree is independent of any consideration whether the river is subject to tides, or is navigable from the sea.

This decree derives no strength from the legislation of Congress, but a strong argument is to be deduced from the act of 1845 in opposition to it. The learned author of the opinion in Delovio *v.* Boit, and in the case of the Thomas Jefferson, (Justice Story,) has the reputation of being the author of the act. He proposed to bring under the judicial administration of the United States, cases that did not belong to the jurisdiction of the admiralty under the authoritative exposition of the Constitution by this court. The first suggestion of the feasibility of such a law is to be found in the opinion given in the case of the Thomas Jefferson, in 1825, and is enough to relieve this court from the imputation of having decided that case without a proper appreciation of the magnitude of the question.

The act of 1845 involves the admission, that cases arising on waters within the limits of the United States other than tidewaters were cases at common law, and that a jury, under the seventh amendment of the Constitution, must be preserved. It was framed on the hypothesis that Congress might increase the judicial power of the United States, so as to comprise all cases arising on, or which related to, any subject to which its legislation extended. It is apparent that this court in 1847, and afterwards in 1848, when the suits of Waring *v.* Clark, and the New Jersey Navigation Co. *v.* The Merchants' Bank, were so elaborately discussed, were wholly unconscious of the fact that this act contained a recognition of any jurisdiction in admiralty, additional to what had been previously exercised.

The only inference that can be drawn properly from the act of 1845, in my opinion, is, that Congress recognised the limit that the decisions in the earlier cases in this court had established for the admiralty and maritime jurisdiction, and its own incapacity to confer a more enlarged jurisdiction of that kind.

I have performed my duty, in my opinion, in expressing at large my convictions on the subject of the powers of the courts of the United States under the clause of the Constitution I have considered.

There have been cases, since I came into this court, involving the jurisdiction of the court on the seas and their tidewaters, the lakes, and the Mississippi river. I have applied the law as settled in previous decisions, in deference to the principle of *stare decisis*, without opposing any objection—though in a portion of those decisions the reasons of the court did not satisfy my own judgment. I consider that the present case carries the jurisdiction to an incalculable extent beyond any other, and all others, that have heretofore been pronounced,

and that it must create a revolution in the admiralty administration of the courts of the United States; that the change will produce heart-burning and discontent, and involve collisions with State Legislatures and State jurisdictions. And, finally, it is a violation of the rights reserved in the Constitution of the United States to the States and the people.